SCOTT D. HICKENBOTTOM, APPELLEE, V. JUDY L. HICKENBOTTOM, APPELLANT.

477 N.W.2d 8

Filed November 22, 1991.    No. 90-1132.

Rita L. Melgares, of Qualley & Associates, for appellant.

Phillip G. Wright, of Quinn & Wright, for appellee.

HASTINGS, C.J., WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

In this dissolution of marriage action, the district court incorporated in its decree the stipulation of the parties that the petitioner-appellee husband, Scott D. Hickenbottom, have reasonable visitation with his former stepdaughter, a child born to the respondent-appellant wife, Judy L. Hickenbottom, on February 3, 1980, during an earlier marriage. The wife assigns the incorporation as error, asserting that she had rescinded the stipulation. We affirm.

The parties, who were married on May 18, 1984, produced two sons, one born on October 26, 1984, and the other on November 4, 1986. During the course of these proceedings, the parties executed a stipulation which made no provision for the younger boy, but gave the wife care, custody, and control of the older boy notwithstanding the fact he had been living with the husband. The stipulation also granted the husband reasonable visitation with the wife's daughter. At trial, the wife testified she

had been coerced into signing the stipulation because the husband told her he would allow the older boy to live with her if she agreed that he, the husband, could have visitation with her daughter.

The record establishes that the husband had lived with his former stepdaughter since she was approximately 2 years old. According to him, the girl's biological father had no contact with her and had paid nothing toward her maintenance. The husband testified that he, on the other hand, enjoyed a father-daughter relationship with her ever since she has been old enough to talk, saying that the girl "has been my daughter . . . ."

The husband also testified that he participated in raising his former stepdaughter in many ways. He disciplined her when she needed it, helped take care of her, cooked her meals, put her to bed, and attended her school plays and parent-teacher conferences. According to the husband, "[t]here was never reference to her as stepdaughter and she never referred to [him] as stepfather"; she calls him "daddy" and is known by his surname.

The husband further testified that he and his former stepdaughter have a mutual loving relationship and that they are quite attached to each other. The girl has been included in the husband's prior visitations with the parties' two boys in activities wherein the four have participated together as a family.

The wife admitted that the three children had "done activities together" and that her daughter likes the husband, but would not go so far as to say the daughter was fond of him.

When asked why she objected to the husband having visitation with the girl, she replied:

> First of all, it's not his child. It's just been me and [the daughter], we have our own life, he has his own life. I just want to get on with it. I don't want him coming and going when he pleases, you know. She was already abandoned, left —— I wouldn't say abandoned, but left by one father. I don't need it by a second father. I won't tolerate it from him. And his harassment, I won't tolerate it.

She also said she objected to the husband's "womanizing around," but this complaint is not elaborated upon.

The evidence persuaded the district court judge that it would be in the girl's best interests to visit with the husband. In so concluding, he noted that the only reasons advanced by the wife for a contrary result had nothing to do with the child's best interests but, rather, relied on the husband's lack of a blood relationship with the child and the wife's desire to get on with her own life without the husband.

We begin by observing that the wife is confused as to her right to rescind the stipulation she executed. As we recently reaffirmed, the parties to litigation are bound by stipulations voluntarily made and are granted relief therefrom only under exceptional circumstances. *White v. Mertens*, 225 Neb. 241, 404 N.W.2d 410 (1987). See, also, *State v. Wells*, 197 Neb. 584, 249 N.W.2d 904 (1977); *Martin v. Martin*, 188 Neb. 393, 197 N.W.2d 388 (1972). There is nothing in this record which demonstrates either the existence of the type of exceptional circumstances which would justify granting relief from the stipulation or that she entered into it other than voluntarily. It is obvious that she at one time during the course of the litigation made the judgment that in order not to have to litigate the issue of custody of the parties' older son, she would agree to give the husband the right to visit her daughter. Such a quid pro quo does not constitute coercion. The fact is that the wife simply changed her mind; a change of mind is not such an exceptional circumstance as to justify relief from a stipulation.

However, the wife's confusion in this regard is unimportant because, as she correctly argues, the parties in a proceeding to dissolve a marriage cannot control the disposition of minor children by agreement. *Hicks v. Hicks*, 223 Neb. 189, 388 N.W.2d 510 (1986); *Eliker v. Eliker*, 206 Neb. 764, 295 N.W.2d 268 (1980); *Koser v. Koser*, 148 Neb. 277, 27 N.W.2d 162 (1947). More is said later in this opinion about the factors to be considered when determining visitation issues.

A stepfather is the husband of a child's mother by virtue of a marriage subsequent to that of which the child is the offspring; thus, a husband who divorces the mother of such a child is no longer the child's stepfather. *Kogon v. Ulerick*, 12 Va. App. 595, 405 S.E.2d 441 (1991). Therefore, the threshold question in this case is whether the district court had jurisdiction to grant

the husband, as the ex-stepparent, the right to visit his former stepdaughter. Of the handful of jurisdictions which have examined this issue, most have concluded, on a variety of theories, that under appropriate circumstances, an ex-stepparent is entitled to visitation with a former stepchild.

Pennsylvania was apparently the first jurisdiction to examine the matter. In *Spells v. Spells*, 250 Pa. Super. 168, 378 A.2d 879 (1977), the Pennsylvania Superior Court held that an ex-stepfather could not be denied the right to visit his former stepchildren just because he lacked any blood relationship to them. In so holding, the court stated at 378 A.2d at 881:

> Clearly, a stepfather and his young stepchildren who live in a family environment may develop deep and lasting mutual bonds of affection. Courts must acknowledge the fact that a stepfather (or stepmother) may be the only parent that the child has truly known and loved during its minority. A stepparent may be as devoted and concerned about the welfare of a stepchild as a natural parent would be. Rejection of visitation privileges cannot be grounded in the mere status as a stepparent.

The *Spells* court discussed the status of one who may " 'put himself in the situation of a lawful parent by assuming the obligations incident to the parental relationship without going through the formality of a legal adoption. . . .' " *Id*. According to the court at 378 A.2d at 882:

> A stepfather who lives with his spouse and her natural children may assume the status "in loco parentis". We may expect that a bond will develop between stepparent and stepchild; we, therefore, should protect that relationship by conferring rights of visitation. The departure of a stepfather from the home would no more destroy the love and affection between stepparent and child than it would in the case of a natural child.

In remanding the cause for a determination of the ex-stepfather's relationship with his former stepchildren, the *Spells* court indicated that a relevant factor in the determination would be whether the ex-stepfather had stood in loco parentis to his stepchildren. See, also, *Simpson v. Simpson*, 586 S.W.2d 33 (Ky. 1979) (adopting the in loco

parentis approach in holding that visitation with a surrogate parent may be in the child's best interests).

Utah used the same approach in *Gribble v. Gribble*, 583 P.2d 64 (Utah 1978). Therein, the ex-stepfather had treated the child in question as his own during the time the two lived together over about a 4-year period. After the divorce, at which time the child was 4 years old, the natural mother objected to any visitation by the ex-stepfather. The relevant Utah statute provided for visitation rights in " 'parents, grandparents and other relatives . . . .' " (Emphasis omitted.) *Id.* at 66. The *Gribble* court stated that while the preexisting stepparent relationship, in and of itself, did not confer any rights or obligations, the assumption of an in loco parentis status put the ex-stepfather in a different position, conferring upon him the same rights as a natural parent. Under this analysis, a former stepparent was within the terms of the statute. The opinion noted that divorce does not terminate the in loco parentis status, observing that "only the surrogate parent or the child is able to terminate the status at will, and the rights, duties, and obligations continue as long as they choose to continue the relationship." *Id.* at 67. The opinion also declared that "a stepfather standing in the status of loco parentis is given the opportunity to seek visitation rights as a right afforded a natural parent, that he should not be permitted to escape the duties and obligations of the loco parentis status as long as that relationship remains intact." *Id.* at 68. With that in mind, the *Gribble* court remanded the cause with directions to make a determination as to whether the right to visitation should be conditioned on a requirement that the ex-stepfather accept the obligation to assist in the financial support of the child.

In *Bryan v. Bryan*, 132 Ariz. 353, 645 P.2d 1267 (Ariz. App. 1982), the natural mother claimed that in a dissolution proceeding the court has "jurisdiction to determine custody only if both parties to the proceeding are parents of the child." *Id.* at 355, 645 P.2d at 1269. Arizona custody proceedings were controlled by a statute providing that " '[a] child custody proceeding is commenced in the superior court: 1. By a parent, by filing a petition: (a) For dissolution or legal separation; or (b) For custody of the child . . . .' " *Id.* Contrary to the mother's

contention that the statute was ambiguous and did not intend that child custody issues be determined in a dissolution proceeding unless both parties were parents of the child, the *Bryan* court concluded that, read literally, the statute meant that when the mother filed a petition for dissolution, she also commenced a child custody proceeding. The court defined the issue as being "whether a stepparent who stands *in loco parentis* to a stepchild may be granted visitation rights when the marriage of the stepparent and the child's natural parent is dissolved." *Id*. at 354, 645 P.2d at 1268. The two earlier statutes had granted jurisdiction to determine custody over the " 'minor children of the parties' " and the " 'children of the marriage,' " respectively. *Id*. at 355, 645 P.2d at 1269. The *Bryan* court reasoned that while this earlier language limited the jurisdiction of the court in custody determinations, the absence of such "limiting language" in the present statute rendered the mother's argument meritless. *Id*. at 356, 645 P.2d at 1270. The *Bryan* court recognized that its ruling departed from the declaration in 27B C.J.S. *Divorce* § 303 at 426 (1959) that "[i]n a divorce suit, the court does not have the power to provide for the care and custody of stepchildren, since there is no common obligation on the parties to the divorce suit for their support." The court concluded that this older rule arose "from an outmoded view that custody and visitation rights are primarily a benefit to the parent, to be enjoyed in compensation for the duty to support." 132 Ariz. at 356, 645 P.2d at 1270. The court went on to explain, however, that Arizona "has long recognized that in matters of child custody it is the welfare of the child, not the gratification of the parent, that is paramount . . . ." *Id*. The *Bryan* court also declared that "[t]he state has a legitimate interest in the welfare of any child whose home is being divided by its laws, and that interest is equally strong regardless of whether the marriage being dissolved is that of both, or only one, of the child's parents." *Id*. See, also, *Rhinehart v. Nowlin*, 111 N.M. 319, 323, 805 P.2d 88, 92 (N.M. App. 1990) (holding that the trial courts are given "exclusive jurisdiction of *all matters* relating to the guardianship, care, custody, maintenance and education of the children," which includes "the granting of visitation rights to a person or persons who the

trial court determines are significant and important to the welfare of the children" (emphasis in original)). But cf. *Olvera v. Superior Court,* 168 Ariz. 556, 815 P.2d 925 (Ariz. App. 1991) (holding court did not have jurisdiction to award custody, either permanent or temporary, to an ex-stepparent, since statute provided that petition for dissolution need only allege names of children "common to the parties," and thus reasonable to conclude jurisdiction in domestic relations cases limited to such children).

In *Carter v. Brodrick,* 644 P.2d 850 (Alaska 1982), an ex-stepfather appealed from a lower court's decision refusing him visitation with his former stepson. The relevant statute permitted a divorce court to make determinations regarding custody and visitation as to " 'any *child of the marriage.*' " *Id.* at 852. The Alaska Supreme Court reversed, and remanded the cause for a determination as to whether the ex-stepfather had stood in loco parentis to the former stepchild. In doing so, the *Carter* court went further than did the *Bryan* court. As noted earlier, the *Bryan* court specifically stated that Arizona's prior statutory language granting jurisdiction over "any child of the marriage" limited custody jurisdiction of the divorce court to children born to, or adopted by, the parties to the proceeding. In contrast, the *Carter* court held that "where a stepparent has assumed the status of in loco parentis, a stepchild is a 'child of the marriage' . . . ." *Id.* at 855. But see, *Perry v. Superior Court of Kern Cty.,* 108 Cal. App. 3d 480, 485, 166 Cal. Rptr. 583, 586 (1980) (holding statute granting jurisdiction over " 'minor children of the marriage' " conferred no jurisdiction to award visitation if the child not " 'of the marriage' "; concurring opinion suggests if ex-stepfather had alleged he had stood in loco parentis, jurisdiction may have existed); *Kogon v. Ulerick,* 12 Va. App. 595, 405 S.E.2d 441 (1991) (holding statute conferring authority to grant visitation to stepparent did not extend to ex-stepparent).

Oklahoma examined the issue of a former stepparent's right to visitation in *Looper v. McManus,* 581 P.2d 487 (Okla. App. 1978). Oklahoma did not adopt the in loco parentis approach but, rather, relied on determining what best serves the interests of the child. In granting an ex-stepmother visitation rights with

a former stepchild for whom she had provided care over a period of approximately 3 or 4 years, the court wrote at 488-89:

> Visitation is not solely for the benefit of the adult visitor but is aimed at fulfilling what many conceive to be a vital, or at least a wholesome contribution to the child's emotional well-being by permitting partial continuation of an earlier established close relationship.
>
> Usually such an affiliation is with a natural parent. But it need not be. Those involved with domestic relations problems frequently see situations where one who is not a natural parent is thrust into a parent-figure role, and through superior and faithful performance produces a warm and deeply emotional attachment.

See, also, *Honaker v. Burnside*, 388 S.E.2d 322, 326 (W. Va. 1989) (holding that best interests of child required that she have visitation with her former stepfather and half brother in order to "ensure that she is not stripped of the right to continue a close relationship with the people she considers her family"); *Temple v. Meyer*, 208 Conn. 404, 544 A.2d 629 (1988) (denying visitation rights to ex-stepfather, but holding that only relevant criterion under the third-party visitation statute is best interests of the child).

In *Shoemaker v. Shoemaker*, 563 So. 2d 1032, 1034 (Ala. Civ. App. 1990), the court held that "[t]here is no prohibition against a former stepparent seeking, and being awarded in appropriate circumstances, visitation privileges with their former stepchild if the best interests of a child are involved and brought to the attention of a trial court." The court did question whether visitation by an ex-stepparent would be in the best interests of the child if the visitation was against the wishes of the natural parent. It stated that its "review of the case law on the subject of 'former stepparent visitation privileges' reveal[ed] that *only* after the best interests and welfare are raised *and* shown to be advanced by such visitation, would a trial court then have the *discretion* to award such privileges." (Emphasis in original.) *Id.* "Such an award would not arise from the relationship or a legal privilege (as granted by statute to grandparents, § 30-3-3) but from the inherent power of the court to act to promote the best interests of a child." 563 So. 2d

at 1034.

In *Collins v. Gilbreath*, 403 N.E.2d 921 (Ind. App. 1980), the court also followed a best interests analysis, although it also hints at the importance of a special in loco parentis relationship. The trial court had awarded visitation rights to a former stepfather despite the lack of a specific request by either of the parties. The natural father of the three children contended that the visitation order was contrary to law, asserting that visitation with an unrelated third party in the form of a former stepfather was not authorized by Indiana law. In upholding the lower court's grant of visitation, the *Collins* court reviewed the law of other jurisdictions and discerned a common thread running through the cases: Where the custodial parent objects to visitation by a third party, the courts generally deny visitation rights. This was especially true "where the relationship between the parties is so strained as to affect the well-being of the child." *Id.* at 923. The court went on to state, however, that while it found the case law instructive, it was not determinative of the issue before it.

> When the judicial system becomes involved in family matters concerning relationships between parent and child, simplistic analysis and the strict application of absolute legal principles should be avoided. The mere protest of a parent who asserts that visitation by another person would somehow harm his or her child should not be enough to deny visitation in all cases. . . . This is especially true where the third party has cared for a child as his or her own.

*Id.* In reaching its decision the *Collins* court emphasized that the trial court had specifically noted that the ex-stepfather had cared for and loved the children as a father for $2^{1}/_{2}$ years. In addition, the court recognized that

> [t]o abruptly end this close relationship and deny him the privilege of ever seeing the girls again would be unfair and traumatic to both [the former stepfather] and the three young girls. The children would in essence lose their second parent in ten days—one by suicide and one by court decree.

*Id.* The *Collins* court made clear its decision was not intended to

open the door such as to allow the "granting of visitation rights to a myriad of unrelated third persons, including grandparents, who happen to feel affection for a child." *Id*. at 923-24. Rather, the court specifically limited its holding to similar factual situations wherein the party pursuing visitation had acted in a parental and custodial capacity. Compare *Evans v. Evans*, 302 Md. 334, 343, 488 A.2d 157, 162 (1985) (holding that "[w]hile an *in loco parentis* status may affect the court's determination as to the best interests of the child," such a relationship did not have to exist under Maryland law before a stepparent could be granted visitation rights).

With that background, we turn our attention to our own statutes. Neb. Rev. Stat. § 42-311 (1943) formerly granted the district courts jurisdiction to determine custody as to the "minor children of the parties." Today, the only statutory authority conferred on district courts to deal with children in dissolution actions is that contained in Neb. Rev. Stat. § 42-364 (Reissue 1988). *Meyers v. Meyers*, 222 Neb. 370, 383 N.W.2d 784 (1986). That statute, the constitutionality of which is not in question, provides, in relevant part:

When dissolution of a marriage or legal separation is decreed, the court may include such orders in relation to any minor children and their maintenance as shall be justified, including placing the minor children in the custody of . . . third parties . . . . Custody and visitation of minor children shall be determined on the basis of their best interests.

§ 42-364.

*Farmer v. Farmer*, 200 Neb. 308, 263 N.W.2d 664 (1978), an action to modify a dissolution decree, is instructive on the question before us. One of the issues was whether the district court had jurisdiction to determine if the husband was the natural father of a child born prior to the marriage. In concluding that such jurisdiction existed, this court looked to § 42-364, as well as to the language of Neb. Rev. Stat. § 42-351 (Reissue 1988), which provides for the jurisdiction of the district court in divorce cases:

(1) In proceedings under sections 42-347 to 42-379, the court shall have jurisdiction to inquire into such matters,

> make such investigations, and render such judgments and make such orders, both temporary and final, as are appropriate concerning the status of the marriage, the custody and support of minor children . . . .

§ 42-351. We also cited Neb. Rev. Stat. § 42-377 (Reissue 1988), which deals with the legitimacy of children, and held that "[t]he above-quoted statutes give the District Court complete jurisdiction over the custody, support, and welfare of all minor children who are touched upon by the divorce proceedings and all related issues." 200 Neb. at 310, 263 N.W.2d at 666. See, also, *State ex rel. Storz v. Storz*, 235 Neb. 368, 455 N.W.2d 182 (1990) (holding that full and complete general jurisdiction over the entire marital relationship and in all related matters, including child custody and support, is vested in district court in which petition for dissolution is properly filed).

In the absence of anything indicating to the contrary, statutory language is to be given its plain and ordinary meaning. When the words of a statute are plain, direct, and unambiguous, no interpretation is necessary or will be indulged to ascertain their meaning. *State v. Matthews*, 237 Neb. 300, 465 N.W.2d 763 (1991); *State v. Rios*, 237 Neb. 232, 465 N.W.2d 611 (1991). Section 42-364 specifically confers upon the district court jurisdiction to award custody to third parties pursuant to a decree of dissolution. As observed in *Carter v. Brodrick*, 644 P.2d 850 (Alaska 1982), it would be inconsistent to rule that the court has jurisdiction to grant custody to the stepparent but lacks jurisdiction to grant visitation.

We therefore conclude the district court had jurisdiction to award the husband rights of visitation with his former stepdaughter. The remaining question is whether it was appropriate for the district court to so order under the circumstances of this case.

We begin this aspect of our review by recalling that in a dissolution of marriage action, determinations as to custody of and visitation with minor children are matters initially entrusted to the discretion of the trial judge, whose determinations, on appeal, will be reviewed de novo on the record and affirmed in the absence of abuse of the trial judge's discretion, keeping in mind, however, that the trial judge

observed and heard the witnesses and accepted one version of the facts rather than the other. *Wyman v. Wyman*, 235 Neb. 287, 454 N.W.2d 692 (1990); *LeDoux v. LeDoux*, 234 Neb. 479, 452 N.W.2d 1 (1990); *Rice v. Rice*, 231 Neb. 428, 436 N.W.2d 518 (1989).

It is also appropriate to recall that the best interests of the child are the primary and paramount considerations in determining visitation rights. *Manewal v. Manewal*, 220 Neb. 867, 374 N.W.2d 39 (1985); § 42-364. This rule, long established in case law and now codified, imposes upon the court the responsibility to make its own determination concerning matters of visitation, which responsibility cannot be forestalled by any agreements or stipulations of the parties. *Schulze v. Schulze*, 238 Neb. 81, 469 N.W.2d 139 (1991); *Lautenschlager v. Lautenschlager*, 201 Neb. 741, 272 N.W.2d 40 (1978). Thus, the trial court always has the power, based on the best interests of the child, to either approve or disapprove stipulations or agreements for visitation. *Lautenschlager v. Lautenschlager, supra*.

Section 42-364(1) provides, in relevant part, that the factors involved in considering the best interests of the children include, but are not limited to, "(a) [t]he relationship of the children to each parent prior to the commencement of the action or any subsequent hearing [and] (c) [t]he general health, welfare, and social behavior of the children."

In *Gerber v. Gerber*, 225 Neb. 611, 619, 407 N.W.2d 497, 503 (1987), we stated that a court is to determine

the nature and extent of visitation rights on a case-by-case basis and may consider many factors and circumstances in each individual case, such as age and health of the child; character of the noncustodial parent; the place where visitation rights will be exercised; frequency and duration of visits; the emotional relationship between the visiting parent and the child; the likely effect of visitation on the child; availability of the child for visitation; likelihood of disrupting an established lifestyle otherwise beneficial to the child; and, when appropriate, the wishes of the child.

In situations similar to those presented by the case before us, some courts have held that the determination of what is in the

best interests of the child involves looking to whether the former stepparent stood in loco parentis with the child. See, e.g., *Simpson v. Simpson*, 586 S.W.2d 33 (Ky. 1979); *Spells v. Spells*, 250 Pa. Super. 168, 378 A.2d 879 (1977). See, also, *Shoemaker v. Shoemaker*, 563 So. 2d 1032 (Ala. Civ. App. 1990); *Temple v. Meyer*, 208 Conn. 404, 544 A.2d 629 (1988). Although the in loco parentis status is not specifically enumerated as a requirement in § 42-364, it is certainly a relevant inquiry in considering the relationship of the children to each parent. Requiring the existence of such a status as a condition to permitting visitation between a former stepparent and a child will help ensure that the door to visitation rights is not open to one merely because he or she has the legal title of stepparent. Thus, we hold that an ex-stepparent pursuing visitation with a former stepchild must establish that during the marriage, he or she acted as a parent to the child.

In *Austin v. Austin*, 147 Neb. 109, 112-13, 22 N.W.2d 560, 563 (1946), we adopted the following:

"A person standing in loco parentis to a child is one who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation, without going through the formalities necessary to a legal adoption, and the rights, duties, and liabilities of such person are the same as those of the lawful parent. The assumption of the relation is a question of intention, which may be shown by the acts and declarations of the person alleged to stand in that relation." 46 C. J., Parent and Child, § 174, p. 1334.

The record shows that the husband had established an in loco parentis status with the former stepdaughter. He lived with her for almost 8 years. They referred to each other as father and daughter; there was a close and loving relationship between them; he was involved in her day-to-day care, including any necessary discipline; and he took an active interest in her education and other school activities.

The only reason the wife gives for objecting to the husband's visitation is that the stepdaughter is "not his child. It's just been me and [the daughter], we have our own life, he has his own life." The fallacy in this position, however, is that once the wife

married the husband, it was no longer just she and the girl; it has been she, the girl, the husband, and the two boys they produced.

The record convinces us, as it did the district court, that the wife is more interested in punishing the husband by denying him access to her daughter than she is in doing what serves the girl's best interests. The girl is not a piece of property; she is a living, breathing, and, as is any child, fragile person who is seemingly already distraught by the destruction of what she has known as her family. There is no need to further damage her by removing the emotional support of one who has cared for her during the marriage.

Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

BOSLAUGH, J., participating on briefs.

FAHRNBRUCH, J., concurring in part, and in part dissenting.

Preliminarily, I agree with the majority's analysis that visitation with a stepchild may be granted to a stepparent who established the status of in loco parentis with the child while married to the child's natural parent.

Additional consideration of the in loco parentis doctrine requires that this cause be remanded to the trial court for further proceedings.

The term "in loco parentis" means in place of a parent, and a "person in loco parentis" is one who has assumed the status *and obligations* of a parent without formal adoption. *Gribble v. Gribble*, 583 P.2d 64 (Utah 1978). The common law concerning termination of loco parentis status is that only the surrogate parent or the child is able to terminate the status at will, and rights, duties, and obligations continue as long as they choose to continue the relationship. *Id*. Since the child in this case is of a tender age, she can only exercise her right to terminate a loco parentis status through a guardian ad litem. No separate guardian ad litem was appointed for her. Because the child's mother bartered the child's visitation with the child's stepfather to obtain the custody of the parties' elder son, her interests and her daughter's interests were in conflict. Likewise, since the stepfather was using both his son and his stepdaughter as

bargaining chips, the stepdaughter's and stepfather's interests were not the same.

As noted by the majority, the wife in this case allowed the stepfather visitation privileges with her natural daughter in return for her husband's giving her custody of the elder son of the parties. Under that type of bartering system, who represented the best interests of the daughter? The trial court did appoint a lawyer as an attorney and guardian ad litem "for the minor children of these parties." It is unclear from the record whether the lawyer was appointed as an attorney and guardian ad litem for only the parties' two sons or for the appellee's stepdaughter as well. Regardless of any guardian ad litem appointment, the parties should not have been permitted to barter either the rights of the elder son of the parties or those of his half sister.

The result of the bartering was reduced to a stipulation which was signed not only by the parties, but also by the guardian ad litem appointed by the court. Each party testimonially admitted their son's custody was granted to the mother conditioned upon the appellee's obtaining visitation rights with his stepdaughter. The trial judge was of the opinion that he could not legally order visitation of the stepdaughter with the appellee. He stated, "I can do something else that effectively provides the same thing, which I'm going to do, and I'm going to adopt the stipulation that they entered into and order that both parties comply with it." The trial judge then pointed out that if Mrs. Hickenbottom chose not to grant Mr. Hickenbottom visitation with her daughter, Mrs. Hickenbottom could be held in contempt of court.

The bartering of custody and visitation rights shown in this record involves the lives and emotions of young children and is nothing short of outrageous. It should be discouraged by this court in the strongest of terms. As we have declared previously, "[c]hildren have the right to be treated as interested and affected persons and not as pawns or chattel of either or both parents." *Hibbard v. Hibbard*, 230 Neb. 364, 366, 431 N.W.2d 637, 639 (1988). The mother's natural daughter and that child's half brother were merely pawns and chattel in this case.

Based upon the record, it is apparent that neither the lawyer

appointed as attorney and guardian ad litem for the parties' children nor the trial court considered the lawyer to be representing Mrs. Hickenbottom's natural daughter. First, no issue was raised by the guardian ad litem as to the liability of Mr. Hickenbottom for support for his minor stepdaughter. Had he done so, the guardian ad litem might well have had a conflict of interest concerning the parties' two sons and the appellee's stepdaughter. Secondly, the court stated, "I am not making any determination that there was any legal right on the [appellee] to have visitation [with his stepdaughter] other than he and his wife entered into an agreement and that agreement showed that that visitation would be in the best interests of the stepdaughter." There is no requirement in the dissolution decree for the appellee to provide child support or other support, such as medical insurance benefits, to his wife's natural daughter.

In the record, there is no indication that the about to be ex-stepfather is willing to continue completely his in loco parentis status. The appellee wants visitation privileges with his stepdaughter, but apparently wants to terminate any of the obligations attendant with an in loco parentis status. By dissolution of her mother and stepfather's marriage, appellee's stepdaughter is deprived of her stepfather's obligation to support her. See Neb. Rev. Stat. §§ 28-705 and 28-706 (Reissue 1989). The appellee has made no provision for his stepdaughter's support, nor did the trial court make any support provision from her stepfather for her. This may be an indication that the stepfather intended to terminate his loco parentis status. Obviously, by their bartering the visitation of one child against the custody of another, the principals in this dissolution proceeding acted in their own interests and gave scant consideration to the best interests of the mother's daughter born of a previous marriage. These facts alone required the trial court to appoint a separate guardian ad litem for the girl.

In *Gribble v. Gribble*, 583 P.2d 64 (Utah 1978), the stepfather offered to set up a trust fund for his stepson. But as in *Gribble*, the stepfather here made no offer to pay child support, and certainly he has no legal duty to do so after a marriage dissolution decree is entered unless he maintains his "loco

parentis" status. In *Gribble* the court declared:

> It may be that if a stepfather standing in the status of loco parentis is given the opportunity to seek visitation rights as a right afforded a natural parent, that he should not be permitted to escape the duties and obligations of the loco parentis status as long as that relationship remains intact. A hearing could determine not only the right to visitation, but could determine whether that right should be conditioned on a requirement that the stepfather accept an obligation to assist in the support of the child. This is not only consistent with the concept of loco parentis but may well be necessary to the child's welfare. *Loco parentis does not envision that a stepparent be permitted to enjoy the rights of a natural parent without also accepting the responsibilities that are incurred.*

(Emphasis supplied.) 583 P.2d at 68.

As stated in *Klipstein v. Zalewski*, 230 N.J. Super. 567, 553 A.2d 1384 (1988), the obligation to support and the right to visitation are correlative and the two legal tenets should be applied in pari materia. Holding a stepparent liable for child support may serve to discourage suits for visitation by one who, rather than wishing to preserve a relationship with a former stepchild, wishes only to annoy or harass a former spouse.

Visitation privileges of stepparents should not be granted lightly. As the *Klipstein* court declared:

> There must be some limits on stepparent visitation rights because in our society it is not difficult to conceive of a child having three, four or even more stepfathers and there are not enough days in a week for the child to have visitation with all of them. Frequently, there will be no satisfactory solution which will please everyone. Justice to both the stepfather and the child, which is the desired objective, can rarely be attained [in certain cases] because the interests of one can be satisfied in many cases only at the expense of the other. And if these competing interests cannot be reconciled, it is the rights of the stepfather which must fall.

230 N.J. Super. at 571, 553 A.2d at 1386.

Equally troubling in this case is the absence of the child's

biological father as a party to the dissolution action. The record reflects that his location was readily available. Although he may be completely indifferent to the child, nonetheless the biological father has a legal interest which he is entitled to protect should he wish to do so. We have held:

> " ' "Indispensable parties to a suit are those who not only have an interest in the subject matter of the controversy, but also have an interest of such a nature that a final decree cannot be made without affecting their interests, or leaving the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience. . . ." ' "

*Koch v. Koch*, 226 Neb. 305, 312, 411 N.W.2d 319, 323 (1987).

It is obvious that granting rights of visitation to a former stepparent may in some cases interfere with some rights of a biological parent who is not otherwise affected by the dissolution proceeding. For example, under some circumstances any rights of visitation granted the former stepparent might disrupt a natural parent's established schedule of visitation. Thus, a stepparent seeking visitation rights with one about to become a former stepchild should be required to join as a party to the dissolution action the otherwise not affected biological parent of the child.

In this case it is conceivable that the biological father may have forfeited any rights he had as the natural parent of appellee's stepdaughter. However, that is not a determination that can be made without giving appropriate notice to the biological father and an opportunity for him to be heard.

This case should be remanded to the trial court, where, after notice to the biological father of the minor child involved and the appointment of a separate guardian ad litem for the child, a determination should be made as to whether the appellee wishes to continue his status of loco parentis to his ex-stepdaughter not only by exercising the privilege of visitation, but also by assuming the obligations of that status. Should Mr. Hickenbottom desire to maintain his loco parentis status and should the trial court find that it is in the best interests of the child that the status of appellee as loco parentis be maintained, then the trial court should require the appellee to appropriately

support the child.

WHITE, J., joins in this concurrence and dissent.