LINDA NOVAK, APPELLEE AND CROSS-APPELLANT, V. GERALD H. NOVAK, APPELLANT AND CROSS-APPELLEE.

508 N.W.2d 283

Filed September 14, 1993.    No. A-91-1142.

Timothy K. Kelso and Albert L. Feldman, of Harris, Feldman, Stumpf Law Offices, for appellant.

Patricia A. Lamberty, of Zweiback, Hotz & Lamberty, P.C., for appellee.

SIEVERS, Chief Judge, and IRWIN and WRIGHT, Judges.

SIEVERS, Chief Judge.

On August 21, 1990, the district court for Douglas County

entered a decree of divorce concerning Gerald H. Novak and Linda Novak. Gerald was ordered to pay child support of $455 per month for each of two children, together with alimony for 6 months at $1,200 per month and then $1,000 per month for 54 months. Additionally, Gerald was ordered to pay Linda a total property settlement of $228,400, of which $165,000 was to be paid in 15 semiannual installments of $11,000 each on March 1 and September 1 of each year beginning in March 1991, the balance being paid by property transfers which have occurred.

Gerald has made the required payments of child support and alimony, but has not made any of the cash property settlement payments. Four months after the entry of the decree, Gerald filed an application to modify with respect to alimony, child support, the property award, attorney fees, and court costs. After an amended application to modify was filed, Linda's demurrer to that application was sustained, and the application was dismissed. Gerald appeals that ruling.

For her part, Linda has attempted to collect the unpaid property settlement amounts by contempt proceedings and garnishments, including attachment of Gerald's individual retirement account (IRA). At the same time that it ruled on the demurrer, the district court found that Gerald was not in contempt, denied Linda's attempt to establish garnishee liability, and found that Gerald's IRA was exempt from attachment. Linda cross-appeals those rulings, which cross-appeal presents the first impression issue of whether an IRA is subject to attachment under the laws of this state.

## DEMURRER TO APPLICATION TO MODIFY

Gerald's amended application to modify alleged that his only source of income was his salary of $2,600 per month from Novak & Sons, Inc., which was $200 per month less than his salary at the time of trial. Gerald alleged that there had been "material and substantial changes in the marital estate, the financial condition of the respondent [husband], and/or other facts and circumstances . . . constitut[ing] good cause to modify the decree of dissolution of marriage . . . ." The application specifically alleged the sale of the Chalet Motor Lodge at an estimated $500,000 loss, as well as pending negotiations with

the Resolution Trust Company to mitigate "the ever-increasing losses being incurred as a result of owning and operating the Park Avenue Health Club (and apartments)."

In the prayer, the application asked for a finding of material and substantial changes in the marital estate and financial condition of the husband constituting good cause to modify the divorce decree and grant relief in three respects: (1) that the property settlement award of $165,000 be terminated and canceled in full, (2) that the alimony and child support provisions be revised to conform to the Nebraska Child Support Guidelines and Gerald's current income, and (3) that the attorney fees and court costs awarded in the decree be reduced to a figure "commensurate with respondent's current economic condition and ability to pay."

Linda demurred on the ground that the amended application did not state facts sufficient to constitute a cause of action. The district court ruled that the demurrer should be sustained, "in that it attempts to modify a judgment of this Court that is final and is not subject to modification, and [the] application to modify shall be dismissed." No further explanation for the ruling was given, nor was Gerald provided an opportunity to amend.

■ As we review that ruling, we bear in mind the often stated proposition of law that when ruling on a demurrer, the petition is to be liberally construed, as a demurrer tests the substantive legal rights of the parties, based on facts and reasonable inferences set forth in the petition seeking relief, and does not test conclusions to be drawn therefrom. See *Matheson v. Stork*, 239 Neb. 547, 477 N.W.2d 156 (1991).

■ A divorce decree, except for purposes of appeal, does not become final for 6 months after its entry. Neb. Rev. Stat. § 42-363 (Cum. Supp. 1992). There was no direct appeal filed from the entry of this decree on August 21, 1990, and Gerald filed his application for modification within the statutory 6-month waiting period. During the first 6 months following the entry of a divorce decree, in the absence of an appeal, control of the decree remains in the judicial discretion of the district court. *Younkin v. Younkin*, 221 Neb. 134, 375 N.W.2d 894 (1985). Modification or vacation of a divorce decree within

the first 6 months after entry requires a showing of good cause. *Miller v. Miller*, 190 Neb. 816, 212 N.W.2d 646 (1973) (holding that Neb. Rev. Stat. § 42-372 (Cum. Supp. 1972) permitting the trial court to modify its decree within 6 months impliedly requires a showing of good cause). Good cause to justify modification of a divorce decree requires a showing of a material change in circumstances after the entry of the decree. See *Morisch v. Morisch*, 218 Neb. 412, 355 N.W.2d 784 (1984). Additionally, the change must be one that was not within the reasonable contemplation of the parties. *Pascale v. Pascale*, 229 Neb. 49, 424 N.W.2d 890 (1988). The $165,000 property division award was not yet final when Gerald's application to modify was filed. Therefore, the issue becomes whether good cause exists to justify such a change and, furthermore, whether Gerald's changed circumstances were contemplated at the time of the original decree.

Neb. Rev. Stat. § 42-366(7) (Reissue 1988) provides that "[e]xcept for terms concerning the custody or support of minor children, the decree may expressly preclude or limit modification of terms set forth in the decree." However, there is no such limitation expressly set forth in the decree of August 21, 1990. Therefore, we can rule out any express restriction on modification in the original decree as a basis for the district court's sustaining of the demurrer.

With respect to Gerald's request to modify alimony, Neb. Rev. Stat. § 42-365 (Reissue 1988) states: "Unless amounts have accrued prior to the date of service of process on a petition to modify, orders for alimony may be modified or revoked for good cause shown . . . ." Consequently, since future alimony payments had not yet accrued, those remaining payments were subject to modification upon good cause shown. Child support is likewise modifiable for good cause shown, although the Nebraska Child Support Guidelines must be followed unless the presumption for their application is properly rebutted.

We observe that the amended application alleged the factual prerequisites from *Pascale* and *Morisch* by setting forth specific facts, including a decrease in salary, the sale of a business property at a large loss, and escalating losses incurred by Gerald in the operation of the Park Avenue Health Club and

apartments. The allegations were factually sufficient to withstand the demurrer.

■ The Novaks' divorce decree was subject to modification, assuming a proper proven evidentiary basis, in all respects when Gerald filed his application to modify or vacate 4 months after its entry, and therefore the district court's ruling that the judgment was final and not subject to modification was simply wrong. In this regard, we have considered whether the district court's ruling could have its basis in the fact that the amended application to modify was filed May 22, 1991, more than 6 months after the entry of the decree, thereby changing the statutory authority for modification from § 42-372 (Reissue 1988) to § 42-365. Although the Supreme Court does not appear to have spoken directly on the issue, we believe that proceedings to modify a divorce decree under § 42-372 may continue and be finally decided after the first 6 months following entry of the decree, so long as the original request was filed within 6 months. See, *Younkin v. Younkin, supra* (Supreme Court remanded to district court for further proceedings well after the 6 months on husband's application to modify decree regarding paternity and support of a child born after the divorce trial); *Miller v. Miller, supra* (motion to set aside and vacate divorce decree filed within 6 months, but hearing and ruling thereupon held in the seventh month).

Accordingly, since Gerald filed his application within 6 months, the fact that an amended application was filed in response to Linda's motion to make more definite and certain, which amended application's filing was outside of the first 6 months, does not make the decree "not subject to modification." We hold that the decree was subject to modification and that the petition's allegations were factually sufficient to withstand the demurrer. Accordingly, we reverse the court's sustaining of the demurrer and dismissal of Gerald's amended application, and we remand the matter for further proceedings.

## CONTEMPT PROCEEDINGS

On October 16, 1991, Linda filed an application for Gerald to show cause why he should not be held in contempt of court, principally for his failure to pay the March and September 1991

property settlement installments of $11,000. Gerald's response to the application for contempt was to allege many of the same matters set forth in his application to vacate or modify the decree, including that he was "unable to pay said property settlement with his current income and existing assets." The contempt matter was heard October 31, 1991, and the trial court ruled that Gerald "has not willfully or contumaciously violated any of the Court's orders as alleged by petitioner." The court made no further findings of fact and gave no explanation for its decision. Linda cross-appeals, arguing that Gerald had the means to pay, but willfully and contumaciously refused to comply with the court's order. Gerald argues that we should affirm the ruling in the absence of an abuse of discretion.

We briefly examine the nature of contempt proceedings. In *Eliker v. Eliker*, 206 Neb. 764, 295 N.W.2d 268 (1980), the Supreme Court explained the difference between civil and criminal contempt, saying that where a party to an action fails to obey an order of the court, made for the benefit of the opposing party, the rule is well recognized that such action is ordinarily a mere civil contempt and thus the rules for criminal contempt are not applicable.

Citing *Eliker*, the court held in *Grady v. Grady*, 209 Neb. 311, 307 N.W.2d 780 (1981), that an action to enforce a court order is normally a mere civil contempt and requires the appropriate standard of proof applicable to civil actions, not the stricter "proof beyond a reasonable doubt" standard applied to criminal contempt. The standard of proof for this case is, therefore, by a preponderance of the evidence, or as is now said, "by the greater weight of the evidence." See NJI2d Civ. 2.12A.

At the time of these contempt proceedings, Gerald was current on alimony and support payments. However, *Grady* involves the use of contempt proceedings to enforce the property division aspects of a divorce decree, including the alleged failure of the husband to secure the release of secondary mortgages. Thus, we view contempt proceedings as an appropriate vehicle for Linda to enforce the property division provisions of this decree requiring Gerald to pay $11,000 on March 1 and September 1, 1991. Contra *Burgardt v. Burgardt,*

474 N.W.2d 235 (Minn. App. 1991).

The standard of review in a contempt case is whether there has been an abuse of discretion. See *Curtis v. Millard School Dist. No. 17*, 217 Neb. 502, 349 N.W.2d 379 (1984). Accordingly, we review the evidence to determine if the district court abused its discretion in finding that Gerald was not in contempt for failure to make payments required by the decree. An abuse of discretion is a ruling of the trial judge which is clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result. *Stewart v. Amigo's Restaurant*, 240 Neb. 53, 480 N.W.2d 211 (1992).

We note at the outset that there is no controversy about the existence of the decree or that Gerald had not made the property settlement payments at issue. Accordingly, the essence of the inquiry is whether he had the means and ability to pay. The fundamental rule at work here is that " '[a] party is not in contempt of court for a failure to comply with an order to pay alimony unless it is shown that he had sufficient ability to pay and that his refusal was wilful and contumacious and without just and reasonable ground.' " *Thuman v. Thuman*, 144 Neb. 177, 179, 13 N.W.2d 117, 118 (1944) (quoting *Wright v. Wright*, 132 Neb. 619, 272 N.W. 568 (1937)). Although *Thuman* speaks of a failure to pay alimony, we think the rule is clearly the same in the instance of a failure to pay property division moneys. We now turn to the evidence on Gerald's ability to pay.

The evidence establishes that Gerald is a 53.5-percent owner of Novak & Sons, Inc., which deals in real estate. Gerald has no personal bank account and has no stocks or bonds except the stock of Novak & Sons, which corporation has not declared dividends or bonuses. At the time of the hearing, his net monthly income from Novak & Sons was $2,092.12. His testimony was that upon receipt of his paycheck, he converts $1,910 to a cashier's check for alimony and child support and transfers it to the clerk of the district court. Gerald's testimony was that he has $182 to live on each month after making child support and alimony payments. He drives a new Ford Explorer, which was procured by the trade-in of his 1988 Jeep plus $14,000 paid by Novak & Sons in July 1991. Gerald has an IRA at Conservative Savings comprised of various certificates of

deposit which, at the time of trial, totaled $54,516.73. Gerald testified that he lives in a condominium for which his parents pay the fees, and his parents also pay his other "miscellaneous living expenses." Gerald testified as follows: "Q. Very well. Have you made any attempt, sir, to obtain the funds from your property to pay any amount due pursuant to the decree entered in this case that have not been paid to date? A. No, I haven't."

On February 4, 1991, approximately 4 weeks before the due date of the first property division payment, the Novak & Sons' Franklin U.S. Government Securities Fund account at Piper, Jaffray & Hopwood, Inc., was worth $47,240.75. On September 4, 1991, that same account was worth $43,370.05.

On February 22, 1991, shortly before the first property settlement payment came due, a second Novak & Sons account at Piper, Jaffray & Hopwood had a balance of $18,685.89. On August 30, 2 days before the due date of the second property settlement payment, the account had $5,103.71. By September 27, the account had $8,132.64. Additionally, Security National Bank of Omaha maintained a Novak & Sons regular account, a Novak & Sons payroll account, and a Park Avenue Health Club account. Gerald signs each of those accounts.

Park Avenue Health Club, which is a division of Novak & Sons, had an account balance of $3,873.84 on February 28, 1991, and $4,820.40 on August 30. The Novak & Sons account had a balance of $19,655.12 on February 28 and $13,060.09 on August 30. The Novak and Sons payroll account had a balance of $1,493.41 on February 28 and $746.44 on August 30.

The Park Avenue Health Club had equity of $600,000 to $700,000 as of the divorce trial, according to the testimony of Gerald in this proceeding. Although Gerald testified that Novak & Sons was not able to pay the total monthly payment of $16,400 on that property, the corporation was paying approximately $2,000 per month for taxes and insurance on it.

When considering the trial judge's decision finding that Gerald was not in contempt, in light of the foregoing evidence, we frankly are at a loss to understand why the trial court would not hold him in contempt. In his testimony, Gerald did not state why he had not made the payments at issue in the contempt

proceeding. Furthermore, he did not prove that the funds of Novak & Sons, which we have detailed, were not available for payment of the obligation to Linda, except that he did testify that he was holding about $25,000 for the installation or repair of a boiler and installation of an alarm system at an apartment complex.

## BURDEN OF PROOF

It is clear beyond dispute that in March and September 1991, the corporation of which Gerald owned 53.5-percent interest had substantial funds. We find that accounts to which Gerald had access or control, as recited above, held $90,949.01 in February 1991 and $67,100.69 in late August 1991. Additionally, Gerald had an IRA worth in excess of $54,000. Although a withdrawal from the IRA means income tax liability and a 10-percent penalty, Gerald is free to access the funds therein at any time, for any reason, including paying his former wife what he owes her under the divorce decree. That Gerald claims a statutory exemption for the IRA, which we will address momentarily, is a different question than assessing whether he had the means to pay in a contempt proceeding, which could include tapping the cash in his IRA.

The decree of the district court awards Linda a total property settlement of $228,400, of which $165,000 is to be paid in cash by the periodic payments involved here and the balance by immediate transfer of property. We believe it is a reasonable inference from the then well-established law that Gerald received at least a like amount of cash or property as his sole property. See *Blaser v. Blaser*, 225 Neb. 104, 402 N.W.2d 875 (1987) (holding that a property division of $1/3$ to $1/2$ as a general rule is an appropriate division). Thus, although we have heard Gerald's plea that he has only $182 per month to live on after paying alimony and child support, the payments at issue reflect a division of the marital estate of the Novaks', not what Gerald should or can pay to Linda from his monthly paycheck. We find it noteworthy that the trial judge, at the time of the decree, awarded fees of $30,064.13 to Linda's attorney, finding that although large, the fees were "reasonably and necessarily incurred in great part as a result of the Husband's

obstructionism . . . ."

We find that Gerald had the means in March and September 1991 to pay the obligation to his former wife through his controlling power, which he did not dispute by evidence, over the Novak & Sons accounts which obviously contained substantial funds, as we have recited. Gerald had the burden to show why he could not pay, given the ample means to do so under his control, but he did not carry that burden. His failure to pay Linda is therefore willful and contumacious contempt of the court's order, which constitutes obstructionism. Accordingly, we find that the district court for Douglas County abused its discretion in not finding Gerald in contempt, and we remand this matter to the district court for further proceedings which shall involve the imposition of coercive sanctions, the exact nature of which the district court shall determine. Our finding that Gerald should have been found in contempt for failing to pay the first two $11,000 installments also includes his failure to pay the sum of $1,067 assessed against him as court costs and attorney fees in the Supreme Court (stemming from contempt proceedings to collect the original award of attorney fees from him, which is referenced in the section of this opinion concerning the IRA), as well as the bill in the amount of $1,052.50 for counseling of the Novaks' children. We find that Gerald had sufficient funds to pay these items and has willfully and contumaciously failed to do so, in violation of the court's order. The district court abused its discretion in finding that Gerald was not in contempt, as there was no tenable reason not to so find.

### ATTACHMENT OF IRA

Linda also cross-appeals that portion of the trial court's decision which held that Gerald's IRA funds were exempt from attachment pursuant to Neb. Rev. Stat. § 25-1563.01 (Reissue 1989). That statute states in relevant part:

In bankruptcy and in the collection of a money judgment, the following benefits shall be exempt from attachment, garnishment, or other legal or equitable process and from all claims of creditors: To the extent reasonably necessary for the support of the debtor and

any dependent of the debtor, an interest held under a stock bonus, pension, profit-sharing, or similar plan or contract payable on account of illness, disability, death, age, or length of service unless:

. . . .

(2) Such plan or contract does not qualify under section 401(a), 403(a), 403(b), or 408 of the Internal Revenue Code of 1986 or the successors of such sections.

Linda argues that the legislative history of that statute indicates that IRA's were considered one of the exemptions under the statute when it was introduced and were specifically identified in the earlier drafts of the bill. However, Linda suggests that since the final form of the statute no longer expressly references IRA's, the inference to be drawn is that the Legislature chose not to include them under § 25-1563.01's protective umbrella. However, such an inference ignores the remaining language of the statute, as well as the continual references to IRA's throughout its legislative history. See, e.g., Floor Debate, L.B. 335, Banking, Commerce, and Insurance Committee, 90th Leg., 1st Sess. 6353 (May 27, 1987) ("[w]hat we have written into the bill is an exemption for retirement vehicles, including not only corporate sponsored plans but Keogh plans and IRAs which are consistent with IRS credits and which are capped by the equitable cap of that amount necessary for . . . reasonably necessary to support the debtor or the debtor's dependents").

The general rules governing statutory construction and interpretation provide that in the absence of anything indicating to the contrary, statutory language is to be given its plain and ordinary meaning; this court will not resort to interpretation to ascertain the meaning of statutory words which are plain, direct, and unambiguous. *Hickenbottom v. Hickenbottom*, 239 Neb. 579, 477 N.W.2d 8 (1991).

The plain language of § 25-1563.01(2) does not protect plans or contracts from exemption unless they qualify under I.R.C. §§ 401(a), 403(a), 403(b), or 408 (1988). Therefore, these code sections control the types of plans available for exemption under the statute. Section 401(a) of the code discusses qualified pension, profit-sharing, and stock bonus plans. Section 403(a)

and (b) deals with employee annuities—qualified annuity plans, 501(c)(3) annuities (nonprofit organizations), and public school annuities. Finally, § 408 specifically addresses IRA's. Thus, Gerald's IRA qualifies under § 408 and is eligible for exemption to the extent provided by the statute.

Linda's argument that IRA's are not exempt under § 25-1563.01 is without merit. However, the fact that IRA's are generally protected under the statute does not mean an IRA can never be attached or garnished. This is where the trial court erred in its ruling on this issue, and on questions of law, this court is obliged to reach a conclusion independent of the decision reached by the trial court. *State ex rel. Grams v. Beach*, 243 Neb. 126, 498 N.W.2d 83 (1993). The court properly found that IRA's were exempt under the statute, but ended its analysis at that point, thereby failing to recognize that the exemption is limited. The plans and contracts protected under § 25-1563.01 are shielded from attachment and garnishment only "[t]o the extent reasonably necessary for the support of the debtor and any dependent of the debtor." A factual finding must be made by the trial court as to whether Gerald's IRA funds are reasonably necessary for his support or the support of his dependents, because if not, the IRA is not exempt from attachment.

We believe it is necessary to remand this matter for additional evidence and the necessary factual determination by the district court. Our rationale is that the district court had previously ruled that Gerald's IRA was exempt from garnishment when Linda's attorneys were attempting to enforce the $30,000 order against Gerald for attorney fees. That separate case was docketed in the Supreme Court as case No. S-91-026. No ruling was made by the Supreme Court on the merits of the district court's holding that the IRA was exempt, as the matter was made moot by Gerald's payment of attorney fees. Accordingly, in these later proceedings, the parties, and particularly Gerald, may have believed that the exemption was absolute and that no evidentiary record was needed on the question of whether the IRA funds were "reasonably necessary" for his support. Consequently, the record is incomplete, and we remand the matter concerning Linda's

attachment of the IRA for further proceedings consistent with this opinion. If Gerald resists attachment, it is reasonable that the burden of proof be imposed upon him as the person in possession of the needed information and the one seeking the exemption. The one who seeks the exemption should prove entitlement to the exemption.

## LINDA'S APPLICATION TO DETERMINE
## GARNISHEE LIABILITY

After Gerald's failure to pay Linda the first $11,000 payment due March 1, 1991, Linda instituted garnishment proceedings. As a result, a summons and order of garnishment and interrogatories were issued by the district court for Douglas County and directed to the garnishee, Property Investment Co., stating that the judgment debtor was Gerald and that he was indebted to the creditor, Linda, in the amount of $11,236.21. That order of garnishment to Property Investment specifically stated: "You are obligated to hold all of the property and credits of every description of the judgment debtor now in your possession or under your control until further order of this court . . . ."

On May 9, 1991, Property Investment, by "Gerald H. Novak, Partner," answered affirmatively that it held property belonging to the judgment debtor and specified, "Judgment debtor is a partner in garnishee company. The partnership currently holds one asset, real property located at 1112 Arbor Street, Omaha, Nebraska. The partnership has no other assets."

On August 13, 1991, Linda filed an "Application to Determine Garnishee Liability," alleging that on July 27, she learned through a pleading filed by Gerald in a matter unrelated to this appeal that the garnishee, Property Investment, had transferred the property at 1112 Arbor Street to Novak & Sons sometime "[s]ince the answer to said garnishment was made." The hearing held by the district court on October 31, 1991, included Linda's application to determine garnishee liability.

In the trial court's order dated November 8, 1991, it held that the application to determine the liability of the garnishee, Property Investment, was not filed "within the statutory period

as required by Sec. 25-1030 R.R.S. Neb 1989, and therefore the garnishee is released from any liability as provided for by the statute." Linda cross-appeals from this order, asserting that the district court erred in the above-quoted finding. Gerald asserts that the pleadings involved in this issue are not found in the transcript, implying that the record is not adequate for this court to rule on the issue.

We dispose of that contention by observing that copies of all relevant pleadings mentioned in the foregoing recitation of the procedural background are found in Linda's exhibit 4, which was offered at the October 31, 1991, hearing and which was received by the court without objection from Gerald. Where a transcript and bill of exceptions filed with an appellate court are sufficient to present all issues, and the case is one for determination solely on the matters contained therein, no further bill of exceptions is required for preservation of any error of law on appeal. *Beeder v. Fleer*, 211 Neb. 294, 318 N.W.2d 708 (1982). The bill of exceptions and the transcript contain what we need to resolve Linda's assignment of error.

At the time the garnishee answered the interrogatories, stating that Gerald, the judgment debtor, was a partner in the garnishee, which held real estate at 1112 Arbor Street, the liability of the garnishee was fixed by statute. Neb. Rev. Stat. § 25-1056(1) (Reissue 1989) provides in part that "[e]xcept when wages are involved, the garnishee shall hold the property of every description and the credits of the defendant in his or her possession or under his or her control at the time of the service of the summons and interrogatories *until the further order of the court*." (Emphasis supplied.) The order of garnishment served on Property Investment contained this statutory language.

When Linda learned that Property Investment had conveyed the property at 1112 Arbor Street to Novak & Sons, she chose the wrong remedy by attempting to determine garnishee liability under Neb. Rev. Stat. § 25-1030 (Reissue 1989). *NC + Hybrids v. Growers Seed Assn.*, 219 Neb. 296, 363 N.W.2d 362 (1985), is the definitive case on the meaning and application of § 25-1030. In that case, NC + obtained a judgment against Growers Seed Association for damages. On May 17, 1982, a

summons in garnishment was served on Steven Booker, and on June 8, he filed his answers to interrogatories, admitting the existence of insurance policies in the form of a " 'Seedsmen's Errors and Omissions, Claims Made Indemnity policy.' " *NC + Hybrids*, 219 Neb. at 297, 363 N.W.2d at 363. However, the answer further provided that " 'there is no debt owing or other obligation owed by the Garnishee to the judgment debtor . . . .' " *Id.* at 297, 363 N.W.2d at 364. NC + took no further action until 15 months after the answers to interrogatories, when NC + filed a request for production of documents, thereby prompting Booker to move for discharge as a garnishee on the basis of § 25-1030. The district court granted Booker's request for discharge, finding that the 20-day requirement of § 25-1030 was mandatory. NC + appealed, causing the Supreme Court to author the definitive interpretation of § 25-1030.

In *NC + Hybrids*, the court referred to the garnishee as a stakeholder or custodian holding property of another who is a party to a lawsuit which produced the judgment for which execution is sought. Normally, such a garnishee is an innocent third party exposed to the inconvenience, hazards, and expense of extended litigation. That Property Investment, a partnership, has Gerald as one of its partners does not affect the application of *NC + Hybrids* to this case. The Supreme Court reasoned as follows:

> In view of the nature of garnishment demanding an expeditious disposition of proceedings, it is reasonable that the Nebraska Legislature sought to protect a garnishee from often unnecessary and sometimes oppressive litigation. See *DeSuno v. Safeco Ins. Co. of America*, 118 Ariz. 553, 578 P.2d 634 (1978). To achieve prompt disposition the Legislature has specified a relatively short time for counteraction by a judgment creditor or garnisher in the *event of any dissatisfaction with a garnishee's disclosure contained in answers to interrogatories*, namely, a written application filed within 20 days in order to determine liability where a garnishee's answers negate a debt, property, or credit due the judgment debtor from the garnishee.
>
> In the application the garnisher may controvert or

traverse the garnishee's response or may allege facts demonstrating that the garnishee owes a debt to the judgment debtor or that the garnishee holds property or a credit of the judgment debtor. By the application the garnisher frames the issue: Does the garnishee owe a debt to the judgment debtor or hold property, funds, or credits of a judgment debtor? The answers of the garnishee and the controverted answers or factual allegations in the garnisher's application constitute the pleading for disposition of the liability issue under § 25-1030. See *Assurance Corp. v. Mitchell*, 120 Colo. 531, 211 P.2d 551 (1949). Contrary to the interpretation suggested by NC + , § 25-1030 does not differentiate types of dissatisfaction requiring an application to determine liability or exonerating the garnisher from filing such application, that is, dissatisfaction with facts vis-a-vis dissatisfaction with conclusions. We are not at liberty to insert into § 25-1030 any language qualifying the dissatisfaction a garnishee may experience for dispensation from the statutory requirements.

(Emphasis supplied.) *NC+ Hybrids*, 219 Neb. at 300-01, 363 N.W.2d at 365-66. NC + argued from a line of cases relieving a garnisher from filing an application for determination of liability. Cf., *Grain Dealers Mutual Insurance Company v. Quarrier*, 175 So. 2d 83 (Fla. App. 1965); *Dunckelman Distributing Company, Inc. v. Hyde*, 334 So. 2d 236 (La. App. 1976). However, the Supreme Court distinguished those cases on the ground that they indicate that a garnisher's counteraction is not necessary where the garnishee's answer admits facts establishing the garnishee's obligation to a judgment debtor.

This is precisely the situation present in this case. Property Investment admitted having property of Gerald's and defined what it was: real property located at 1112 Arbor Street in Omaha. Section 25-1030 sets forth the procedure to be used when a garnisher is dissatisfied with the answer as to whether a debt is owed by the garnishee to the judgment debtor or whether the garnishee holds property, funds, or credits of the debtor. In other words, § 25-1030 sets forth the procedure for

litigation between the garnishee and the garnisher over whether a debt is owed or property or funds held, and the extent thereof. Here, the garnishee admitted that it held real property in which Gerald had an interest as a partner.

*NC + Hybrids* holds that the issues in a § 25-1030 proceeding are formed by the garnishee's answers to interrogatories and the garnisher's application, which controverts or traverses those answers. The § 25-1030 proceeding brought by Linda was not an appropriate proceeding, given the unqualified admission by Property Investment that it held property in which Gerald had an interest. Linda was not dissatisfied with this answer, but, rather, was understandably dissatisfied when she learned that the garnishee, Property Investment, had conveyed the real estate at 1112 Arbor Street to Novak & Sons after answering the interrogatories. This conveyance was in blatant disregard of the court's order and the provisions of § 25-1056 requiring that the property be held by the garnishee *until further order of the court.*

Linda's remedies included an attempt to set aside the conveyance, as well as to hold the garnishee and Gerald in contempt. Her remedy did not include proceedings under § 25-1030, as there was no dissatisfaction with the garnishee's answers to interrogatories. This is why Linda's application should have been dismissed. Thus, we affirm the district court's dismissal of the application, but for a different reason. The law is clear that a right result will be affirmed, even if the appellate court disagrees with the reason given by the lower court. See *Wymore v. Wymore,* 239 Neb. 940, 479 N.W.2d 778 (1992).

## CONCLUSION

We have found that the district court improperly sustained the demurrer to Gerald's application to modify the provisions of the divorce decree. At the same time, we have found that Gerald was in contempt of court for failure to make the two property division payments due his former wife at a time when he had the means to do so. Those two results may seem superficially anomalous. However, the evidence is clear that Gerald had the means to pay the March 1 and September 1, 1991, payments of $11,000 each, irrespective of what his

financial condition might have been with respect to his ability to carry the full burden of the $165,000 over 7¹/₂ years, as well as to pay the child support and alimony which were also ordered. Thus, separate issues are presented by the contempt proceedings with respect to the first two payments, when contrasted with Gerald's attempt to modify the full range of long-term financial obligations imposed upon him by the decree.

Nonetheless, Gerald was entitled to introduce, in defense of Linda's action to hold him in contempt, any evidence bearing on his financial condition and whether he had the means to pay the two $11,000 payments at issue when they were due. Some of that same evidence would obviously also go to the question of Gerald's entitlement to a modification of the decree. However, Gerald's evidentiary showing was clearly insufficient to prevent a finding that he had the means to make the first two payments. Thus, although a different result might eventually occur regarding future payments of alimony, child support, and the balance of the property division payments, depending upon the ultimate outcome of his application to modify, which we have remanded for further proceedings, Gerald clearly was willfully in contempt of court with respect to the first two payments.

The district court was correct in dismissing Linda's application to establish garnishee liability, but erred in its decision that Gerald's IRA was unconditionally exempt from attachment. Accordingly, we also remand to the district court the attempted attachment of the IRA for further proceedings to determine whether the funds contained in that account are reasonably necessary for Gerald's support or the support of his dependents, which is the basis for the limited exemption under § 25-1563.01.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.