648 A.2d 1016

**John H. PETRINI**

v.

**Debra B. PETRINI.**

**No. 15, September Term, 1994.**

Court of Appeals of Maryland.

Oct. 25, 1994.

454

Steven P. Resnick, Annapolis, for petitioner.

Steven R. Migdal (Snider, Buck & Migdal, Chtd. on brief), Annapolis, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

MURPHY, Chief Judge.

The principal question presented is whether a trial court can consider non-cash gifts to a parent in determining the amount of that parent's actual income for the purpose of calculating his child support obligation pursuant to Maryland's Child Support Guidelines. *See* Maryland Code (1984, 1991 Repl.Vol.) §§ 12–201 *et seq.* of the Family Law Article.[1]  Also

---

1. Unless otherwise indicated, all statutory references are to the Maryland Code (1984, 1991 Repl.Vol.) Family Law Article.

to be considered is the extent of a trial judge's discretion in making a decision concerning an award of child custody.

## I.

Petitioner John Petrini (John) and Respondent Debra Petrini (Debra) were married on October 9, 1984. The couple had one child: Edgar Jacob Petrini, III (Eddie) who was born on July 23, 1987. The Petrinis separated several times during their almost eight year marriage. On July 9, 1989, Debra left the marital home for good and on July 25, 1990, she filed a Complaint for Divorce in the Circuit Court for Anne Arundel County; she sought custody of Eddie along with child support and attorney's fees. John filed a Counter–Complaint for Divorce in which he too prayed for custody of Eddie and for child support.

After a four day trial, the court (Wolff, J.) granted Debra a divorce. It awarded sole custody of Eddie to Debra, allowing John liberal visitation with his son. While the parties initially petitioned for joint custody of their son, the court concluded that joint custody would not be in Eddie's best interest. The court also awarded child support in the amount of $81.31 per week to Debra. Although the court found John's take-home income to be only $14,063.00 in 1991, it found that his mother allowed her son to reside in one of her homes rent-free, that she paid the expenses relating to his illeostomy bag, and that she paid Eddie's health insurance premiums.[2] Respectively, these items had a value of $688.00 per month, $600.00 per year, and $1,392.00 per year. The court determined that these items constituted "actual income" to John, as that term is defined in § 12–201(c)(4)(iii). The court, therefore, increased the amount of actual income received by John by $10,248.00 to reflect these "gifts" and thereby calculated John's "actual income" to be $24,311.00 for purposes of com-

---

2. The court found Debra's income to be approximately $12,000.00 in 1991.

puting the amount of his child support obligation under the statutory guidelines.[3]

The court also ordered John to contribute $3,000.00 toward the cost of Debra's legal expenses. It explained the basis for its rulings on support, attorney's fees, and custody in a detailed oral opinion on May 13, 1992. Thereafter, John noted an appeal to the Court of Special Appeals, seeking a reversal of the court's judgment as to the award of child support, attorney's fees, and child custody. The intermediate appellate court, in an unreported opinion, affirmed the judgment of the lower court. We granted certiorari to consider the important issues raised in the case.

## II.

We first consider whether the trial court properly determined the amount of child support to which Debra was entitled when it increased John's annual take-home income to account for the "gifts" received from his mother. We next determine whether the trial court abused its discretion by requiring John to contribute $3,000.00 to the cost of his former wife's legal expenses. And, finally, we decide whether the trial court properly applied the "best interest" of the child standard in awarding sole custody of Eddie to his mother.

## A.

### *Child Support*

■■ That both parents have a legal as well as a moral obligation to support and care for their children is well-settled in Maryland. This legal duty is based on both common law and statutory authority. *See* § 5–203(b)(1). *See also Middle-*

---

**3.** The court did not factor in *all* the monetary contributions that John's mother made to subsidize her son's living expenses. It did not consider the clothing, gas, food, and credit card payments that the mother made for her son because the court was unsure for how long and to what extent these "gifts" would continue. Nor did it consider numerous cash gifts which the mother made to John on a regular and continuing basis.

*ton v. Middleton,* 329 Md. 627, 631–33, 620 A.2d 1363 (1993). In making an award of child support, it is for the trial judge to set an amount reasonably calculated to maintain as nearly as possible the standard of living enjoyed by the child prior to the parents' divorce.

In February of 1989, the General Assembly put into effect statutory Child Support Guidelines (the guidelines), which were adopted by adding Subtitle 2 to Title 12 of the Family Law Article.[4] The purpose of the guidelines was to limit the role of trial courts in deciding the specific amount of child support to be awarded in different cases by limiting the necessity for factual findings that had been required under pre-guidelines case law.[5] The legislature also intended the guidelines to remedy the unconscionably low levels of many child support awards when compared with the actual cost of raising children, to improve the consistency and equity of child support awards, and to increase the efficiency in the adjudication of child support awards. *Voishan, supra,* 327 Md. at 322, 609 A.2d 319. *See also Tannehill v. Tannehill,* 88 Md.App. 4, 11, 591 A.2d 888 (1991). To accomplish these goals, the legislature promulgated certain uniform calculations that must be made in making any child support determination.[6]

While the Child Support Guidelines were merely advisory when they were first adopted, their use became mandatory when ch. 58 of the Acts of 1990 was enacted. A rebuttable presumption was thereby created that an award reached by

---

4. For a good discussion of the genesis and the proper application of Maryland's Child Support Guidelines, see Judge Chasanow's opinion, for the Court, in *Voishan v. Palma,* 327 Md. 318, 322–24, 609 A.2d 319 (1992).

5. Pre-guidelines support awards were determined by trial courts by balancing the best interests and needs of the children with their parents' financial ability to meet those needs. *Unkle v. Unkle,* 305 Md. 587, 597, 505 A.2d 849 (1986). Other factors taken into consideration by courts in exercising their discretion were the parties' station in life, their age and health, and possible future educational expenses. *Id.*

6. The procedures for determining the appropriate amount for a support award are set forth in § 12–204.

applying the guidelines is the proper amount of child support to be awarded. *Voishan, supra,* 327 Md. at 323–24, 609 A.2d 319. This presumption can be rebutted by showing evidence that applying the guidelines would be unjust or inappropriate in a particular case. The legislature set forth certain criteria that should be considered in determining whether the application of the guidelines would be unjust or inappropriate.[7] *See* § 12–202(a)(2). If the court does conclude that the application of the guidelines would be unjust or inappropriate, it must make a written or oral finding on the record explaining its departure from the established guidelines. *Walsh v. Walsh,* 333 Md. 492, 501–502, 635 A.2d 1340 (1994).

■ A basic child support obligation is determined using the schedule for that purpose set forth in § 12–204(e); it is divided proportionately between the parents in relation to their "adjusted actual incomes."[8] According to § 12–201(c), "actual income" is defined as "income from any source."[9] In addition to the categories of actual income mentioned in § 12–

---

**7.** These criteria include the terms of any existing separation or property settlement agreement or court order that provide for the financial support of minor children and the existence of other children to whom either parent already owes a duty of support. *See* § 12–202(a)(2)(iii).

**8.** "Adjusted actual income" is actual income less "(1) preexisting reasonable child support obligations actually paid; (2) ... alimony or maintenance obligations actually paid; and (3) the actual cost of providing health insurance coverage for a child for whom the parents are jointly and severally responsible." *See* § 12–201(d). In addition, work-related child care expenses, extraordinary medical expenses, and school and transportation expenses may be added to the basic child support obligation. *See* § 12–201(g), (h), and (i).

**9.** According to § 12–201(c)(3), "actual income" includes, but is not limited to:
(i) salaries; (ii) wages; (iii) commissions; (iv) bonuses; (v) dividend income; (vi) pension income; (vii) interest income; (viii) trust income; (ix) annuity income; (x) Social Security benefits; (xi) workers' compensation benefits; (xii) unemployment benefits; (xiii) disability insurance benefits; (xiv) alimony or maintenance received; and (xv) expense reimbursements or in-kind payments received by a parent in the course of employment, self-employment, or operation of business to the extent the reimbursements or payments reduce the parent's personal living expenses.

201(c)(3), § 12–201(c)(4) provides that *"[b]ased on the circumstances of the case,* the court may [also] consider the following items as actual income: (i) severance pay; (ii) capital gains; (iii) *gifts;* or (iv) prizes" for the purpose of determining a party's child support obligation. (Emphasis supplied) The types of "gifts" that may be includable as part of a parent's actual income in a particular case is within the court's discretion, and should only be reversed if it acted arbitrarily in exercising its discretion or if the judgment on the matter was clearly wrong. *Gates v. Gates,* 83 Md.App. 661, 663, 577 A.2d 382 (1990). *See also Kramer v. Kramer,* 26 Md.App. 620, 636, 339 A.2d 328 (1975).

The General Assembly intentionally designed the guidelines to place decisions concerning whether "gifts" to a parent should be considered part of that person's "actual income," and the items properly to be considered "gifts," within the sound discretion of the trial court. This intent is clear upon review of the legislative history of the guidelines. Initially, the legislature included "gifts" as part of § 12–201(c)(2), which enumerates an extensive list of categories of things that must be considered in calculating a parent's "actual income." Before the guidelines reached their final form, however, § 12–201 was revised and the category of "gifts" was taken out of § 12–201(c)(2) and put into § 12–201(c)(4), which specifically leaves the decision concerning whether certain contributions to a person's well being should be considered part of that party's "actual income" within the sound discretion of the trial court, taking into account the totality of the circumstances.

▮ John argues that the court abused its discretion when it increased his take-home income to reflect the "gifts" that he received from his mother. These "gifts," as we earlier discussed, included rent-free housing valued at $688.00 per month, the expenses surrounding John's illeostomy valued at $600.00 per year, and the cost of Eddie's health insurance premiums valued at $1,392.00 per year. John maintains that these items do not amount to "gifts" within the meaning of § 12–201(c)(4). His primary argument is that he receives no

tangible funds from these non-liquid and non-marketable assets from which he can pay an increased level of child support. John further argues that even if the contributions made to him do constitute "gifts" under the guidelines, they should not have been considered part of his actual income under the circumstances of his case. He attempts to illustrate the inequity of attributing what he calls "phantom income" to him by asserting that doing so leaves him with a negative after-tax income.

Neither the legislature in the statute, nor the courts in existing case law, have specifically defined what the word "gifts" means in the context of the guidelines. Thus, we must undertake to extrapolate its meaning from its general usage. Webster's Third New International Dictionary 956 (1981) defines a "gift" as "something that is voluntarily transferred by one to another without compensation." Black's Law Dictionary 688 (6th ed. 1990) defines a "gift" as "a voluntary transfer of property to another made gratuitously or without consideration." The benefits conferred upon John by his mother fit within both of these definitions.[10]

As we see it, the General Assembly purposely did not define with pin-point precision what it intended the term "gifts" to encompass under the guidelines; rather it afforded trial courts the latitude to consider all the relevant circumstances in a particular case before making any determination about what should be considered in calculating a parent's support obligation. Some of the considerations that might be

---

**10.** New York's child support guidelines include a similar provision to Maryland's § 12–201(c)(4). According to art. 13, § 240 1–b(b)(5)(iv) of the New York Consolidated Laws Service, "at the discretion of the court, the court may attribute or impute income from, such other resources as may be available to the parent, including, but not limited to: (A) non-income producing assets, ... and (D) money, goods, or services provided by relatives or friends." These categories seem to encompass the same sort of contributions to a parent's income as the General Assembly might have intended to include when it used the term "gifts."

made by a trial judge include: a parent's actual ability to pay the specified child support award, any lack of liquidity or marketability of a party's assets, the fact that a parent's take-home income is not an accurate reflection of his or her actual standard of living, and whether either party is voluntarily impoverished. All of these factors came into play in this case and were considered by the trial court in making its award.

Our limited task is to determine whether the trial court abused its discretion in deciding that the gifts conferred upon John constitute actual income under § 12–201(c)(4). The trial court, in its opinion, stated that "the guidelines tell us, that if you get [gifts], they're to be considered as income, cause it's something you don't have to spend for." We agree that when the Child Support Guidelines were formulated the drafters took into consideration the fact that everyone has certain basic living expenses, such as room and board, which must be paid out of their take-home income. Thus, if a parent is relieved of some of these expenses through outside contributions, it may be appropriate under certain circumstances to increase the parent's actual income to account for such contributions. Manifestly, these benefits may have the effect of freeing up other income that may not have otherwise been available to pay a child support award. In considering the circumstances surrounding John's financial situation, the court decided that the most equitable resolution required inclusion of the subject benefits conferred upon John as part of his actual income. The evidence presented at trial supported this conclusion by the court. It established that John has never needed to engage in full-time employment because his mother in addition to providing him with rent-free lodging, paying health insurance premiums, and covering the cost of his illeostomy bag, also paid some of his daily living expenses—such as food, gas, and clothing—as well as giving him large cash payments to do with as he wished. Essentially, John's mother paid for things that he would otherwise have been responsible for paying for himself out of his take-home salary.

The trial court also found that because John always seemed to have resources available to buy whatever he needed or wanted, he could afford to work only when he felt like it.[11] John admitted that he has received regular subsidies of approximately $500.00 per week from his mother over a long period of time to supplement his income as a part-time boatyard mechanic.[12]  He accounted for these subsidies as "additional income" on his financial affidavit submitted to the court in this case.  Therefore, the trial court found that John's take-home income was not an accurate measure of his ability to pay child support for Eddie.

The Court of Special Appeals dealt with a somewhat similar situation in *Goldberger v. Goldberger*, 96 Md.App. 313, 624 A.2d 1328 (1993), *cert. denied*, 332 Md. 453, 632 A.2d 150 (1993).  In that case, Aron Goldberger, an Orthodox Jew, purportedly had devoted his entire life to the study of the Torah/Talmud.  As a consequence, he had never been employed at an income-producing vocation, even before he got married and had children.  He had been supported by others—his parents, his father-in-law, and friends in the Orthodox community—throughout his entire life, and thus had consistently relied upon the charity of others to provide his family with the necessities of life.

Based on these circumstances, the trial court found that Goldberger was "voluntarily impoverished."  Because he had no "actual income" as defined by the guidelines, the court imputed what it found to be his "potential income" based on

---

**11.**  John's own witness, his employer Robert Noyce, testified that John had the ability and experience to earn between $17.50 and $35.00 per hour if he had worked full-time in the marina business in 1991, the year prior to the parties' divorce.  John reported a gross income of only $15,389.00 in 1991, a figure far less than this purported potential earning capacity.

**12.**  Even though John admitted in court that he received approximately $500.00 per week in gift subsidies from his mother, the trial court only added the equivalent of $200.00 per week to his take-home salary to arrive at the actual income which was to be used in calculating his support obligation.

various delineated factors.[13]  *See* § 12–201(b).  In finding Goldberger to be voluntarily impoverished, the Court stated:

> [a] parent who chooses a life of poverty before having children and makes a deliberate choice not to alter that status after having children is also "voluntarily impoverished."  Whether the voluntary impoverishment is for the purpose of avoiding child support or because the parent simply has chosen a frugal lifestyle for another reason, doesn't affect that parent's obligation to the child.  Although the parent can choose to live in poverty, that parent cannot obligate the child to go without the necessities of life.  A parent who brings a child into this world must support that child, if he has or reasonably could obtain, the means to do so.  The law requires that parent to alter his or her previously chosen lifestyle if necessary to enable the parent to meet his or her support obligation.

*Goldberger, supra,* 96 Md.App. at 326–27, 624 A.2d 1328.

According to this analysis, John might have been considered "voluntarily impoverished," but the court did not so find.  Instead it determined that because John did not work full-time on a regular basis, and because he did not stop working up to his potential just to avoid paying child support to his son, he was not voluntarily impoverished as defined by the case law.  Rather, as we have said, the court, exercising its discretion, considered the "gifts" from his mother as part of John's actual income in calculating his support obligation.  Supportive of this determination is the case of *Walsh, supra,* 333 Md. at 502, 635 A.2d 1340, holding that a husband's obligation to pay part of the mortgage payment on a family home in which his former wife and children lived under a use and possession order was to be considered income to the wife, resulting in a

---

**13.**  These factors include a person's age;  mental and physical condition;  assets;  educational background, special training, or skills;  prior earnings;  efforts to find and retain employment;  the status of the job market in the area where the parent lives;  actual income from any source;  and any other factor bearing on the parent's ability to obtain funds for child support.  *Goldberger, supra,* 96 Md.App. at 327–28, 624 A.2d 1328.

reduction of the husband's income for the purpose of calculating his support obligation under the guidelines. Here, as in *Walsh*, money is made available to the party benefitting from the contribution that would not have otherwise been available to pay this ordinary living expense.

John's final argument is that his mother's contributions may not continue indefinitely, and that no account was taken of this likely eventuality. Of course, should John's mother become unable or unwilling to continue supporting her son in the fashion that she has maintained over the past several years, John may petition the court for a modification of his child support obligation based upon a showing of a "material change of circumstances." *See* § 12–104.

We thus conclude that the trial court, in the circumstances of this case, properly considered the subject gifts supplied to John by his mother on a regular basis, thereby justifying the increase in John's "actual income" by approximately $10,000.00 in calculating his child support obligation under the guidelines.

### B.

#### *Attorney's Fees*

According to § 12–103, a trial court may award to either party "the costs and counsel fees that are just and proper under all the circumstances in any case in which a person applies for a decree ... concerning the custody, support, or visitation of a child of the parties." Section 12–103 goes on to state that before a court can award such costs and fees, it must consider "the financial status of each party; the needs of each party; and whether there was substantial justification for bringing or defending the proceeding." When the case permits attorney's fees to be awarded, they must be reasonable, taking into account such factors as labor, skill, time, and benefit afforded to the client, as well as the financial resources and needs of each party. *Brown v. Brown*, 204 Md. 197, 213, 103 A.2d 856 (1954). *See also Waters v. Waters*, 191 Md. 436, 441, 62 A.2d 250 (1948).

Decisions concerning the award of counsel fees rest solely in the discretion of the trial judge. *Jackson v. Jackson,* 272 Md. 107, 111–12, 321 A.2d 162 (1974). The proper exercise of such discretion is determined by evaluating the judge's application of the statutory criteria set forth above as well as the consideration of the facts of the particular case. *Id.* at 112, 321 A.2d 162. Consideration of the statutory criteria is mandatory in making the award and failure to do so constitutes legal error. *Carroll County v. Edelmann,* 320 Md. 150, 177, 577 A.2d 14 (1990). An award of attorney's fees will not be reversed unless a court's discretion was exercised arbitrarily or the judgment was clearly wrong. *Danzinger v. Danzinger,* 208 Md. 469, 475, 118 A.2d 653 (1955). *See also Broseus v. Broseus,* 82 Md.App. 183, 200, 570 A.2d 874 (1990).

Consistent with these decisions, the court looked to the parties' needs and resources; their financial status; the labor, skill, and time expended by each party's attorney; and the benefit to the child of awarding attorney's fees to the mother. In addition, the court allowed John to pay the $3,000.00 award in twelve monthly installments. We find no error in the counsel fee award.

## C.

### *Child Custody*

Child custody awards have traditionally been predicated on the "best interest" of the child involved. *See e.g. Monroe v. Monroe,* 329 Md. 758, 769, 621 A.2d 898 (1993); *McCready v. McCready,* 323 Md. 476, 481, 593 A.2d 1128 (1991); *Taylor v. Taylor,* 306 Md. 290, 303, 508 A.2d 964 (1986); *Ross v. Hoffman,* 280 Md. 172, 174–75, 372 A.2d 582 (1977); *Hild v. Hild,* 221 Md. 349, 357, 157 A.2d 442 (1960). That which is in a child's best interest is not always easy to determine. As we pointed out in *Taylor, supra,* 306 Md. at 303, 508 A.2d 964:

[f]ormula or computer solutions in child custody matters are impossible because of the unique character of each case, and the subjective nature of the evaluations and decisions that

must be made. At best we can discuss the major factors that should be considered in determining [which parent should be given custody], but in doing so we recognize that none has talismanic qualities, and that no single list of criteria will satisfy the demands of every case.

Therefore, over the years, Maryland courts have set forth a variety of objective criteria to be considered in determining which parent should be awarded custody of their minor children. While custody determinations must be made on a case-by-case basis due to the uniqueness of the fact patterns in such disputes, factors relied upon in past cases can be used to guide the trial court's decisionmaking process. *Ross, supra,* 280 Md. at 187–88, 372 A.2d 582. In this regard, trial courts are endowed with great discretion in making decisions concerning the best interest of the child.

In *Hild, supra,* 221 Md. at 349, 157 A.2d 442, we observed:

[f]or the purpose of ascertaining what is likely to be in the best interests and welfare of the child a court may properly consider, among other things, the fitness of the persons seeking custody, the adaptability of the prospective custodian to the task, the age, sex, and health of the child, the physical, spiritual and moral well-being of the child, the environment and surroundings in which the child will be reared, the influences likely to be exerted on the child, and, if he or she is old enough to make a rational choice, the preference of the child. It stands to reason that the fitness of a person to have custody is of vital importance. The paramount consideration, however, is the general overall well-being of the child.

An even more comprehensive list of factors to be considered in making custody determinations is contained in *Montgomery County v. Sanders,* 38 Md.App. 406, 381 A.2d 1154 (1978), which distills the holdings in numerous cases of this Court delineating the governing criteria. Of course, the controlling factor, or guiding principle, in both custody and adoption cases is not the natural parents' interest in raising the child, but rather what best serves the interest of the child; the para-

mount consideration is what will best promote the child's welfare, a consideration that is of "transcendent importance." *In Re Adoption No. 10941,* 335 Md. 99, 113, 642 A.2d 201 (1994); *In Re Adoption No. A91–71A,* 334 Md. 538, 561, 640 A.2d 1085 (1994).

The standard of review in custody cases is whether the trial court abused its discretion in making its custody determination. *Davis v. Davis,* 280 Md. 119, 125, 372 A.2d 231 (1977), *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), *reh. denied,* 434 U.S. 1025, 98 S.Ct. 754, 54 L.Ed.2d 774 (1978). In setting forth this standard, we concluded that "when the appellate court views the ultimate conclusion of the chancellor founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the chancellor's decision should be disturbed only if there has been a clear abuse of discretion." *Davis, supra,* 280 Md. at 126, 372 A.2d 231. *See also Robinson v. Robinson,* 328 Md. 507, 513–14, 615 A.2d 1190 (1992); *Domingues v. Johnson,* 323 Md. 486, 491–92, 593 A.2d 1133 (1991); *Ross, supra,* 280 Md. at 186, 372 A.2d 582. Particularly important in custody cases is the trial court's opportunity to observe the demeanor and the credibility of the parties and witnesses.

John argues that the court's decision was not supported, and was in fact contradicted, by its factual findings. He maintains that the court's custody award to Debra was based upon a "gut feeling," and not as a result of factual findings made pursuant to the legally governing criteria. John suggests that because the court found that all but one of the factors considered favored neither party and because the remaining factor appeared to favor him, the award of custody should have been to him. We disagree. The court's decision was based on detailed factual findings and extensive deliberation concerning Eddie's best interest and we find no abuse of the court's discretion.

In applying the controlling criteria, the trial court found that, while both parties had suffered from addiction problems

in the past, at the present time they both appear to be "equally fit" to raise their son. Next, it stated that "there's nothing as to the character or reputation of either that would play a factor in deciding custody." With regard to the potentiality of maintaining natural family relations, the court found that the evidence cut both ways. While it recognized that John has a large extended family in the area which can be considered a positive factor, and that Debra does not, it stated that, even though John's family helps him, they "probably help him too much, and probably to the child's detriment" and that such interference was probably one of the causes of the marriage's break-up.

Next, the court found that Eddie was too young to make a meaningful or rational choice as to the parent with whom he would prefer to live. As to opportunities affecting the future life of the child, the court concluded that neither parent had anything more to offer to the child by way of material advantages than the other parent. It found that the "gifts" from John's mother were not a factor in determining whether John can offer Eddie any material advantages, especially because John has no control over the extent or duration of these contributions.

The court found that the age, sex, and health of Eddie had no bearing on which parent should be awarded custody. Both parents' residences were determined to be suitable for raising a minor child. In addition, the court found that Eddie had never been completely separated from either parent; rather he had spent a substantial amount of time with both his parents since Debra left the marital home in July of 1989. Nor did the court find an abandonment or surrender of custody of Eddie by either party at any time.

John urges that the court's custody award was inappropriately based on what it called a "gut feeling." When taken in context, and the court's decision is considered in its entirety, it is clear that its determination was grounded on far

more than an unsupported whim as John posits. As the court carefully explained, it weighed all the appropriate factors; it considered all the documentary evidence, as well as all the witnesses' testimony; and it took into account its personal observations and impressions of the parties and witnesses.[14]

As we said in *Domingues, supra,* 323 Md. at 492, 593 A.2d 1133:

> The evidence in a given case may be sufficient to support an award of custody to either parent.... [I]t is quite often the case that both parents are entirely "fit" to have legal and/or physical custody of a child, but joint custody is not feasible. In such cases, the chancellor must exercise his or her independent discretion to make the decision.... [I]n the final analysis, the decision must be made by the chancellor.

Based on its factual findings, the court's award was not clearly erroneous; instead it constituted a lawful exercise of the sound discretion vested in it.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.*

---

14. The court gave little weight to Patricia Tenanty's opinion that Eddie would be better off living with his father. Ms. Tenanty, a licensed social worker, acted as Eddie Petrini's therapist and in that role she met with Eddie and both of his parents many times, providing therapy for Eddie on approximately 50 occasions. Of course, it was well within the court's discretion to decide which witnesses it found to be credible.