REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1691
September Term, 2012

JOHN BEAUCHAMP REYNOLDS, III

v.

VALERIE LAMBIASE REYNOLDS

Matricciani,
Hotten,
Eyler, James R.
 (Retired, Specially Assigned),

JJ.

Opinion by Matricciani, J.

Filed:  February 26, 2014

Appellee, Valerie Lambiase Reynolds ("Wife"), sued appellant, John Beauchamp Reynolds, III ("Husband"), for absolute divorce on September 16, 2010, in the Circuit Court for Montgomery County, Maryland. Husband counter-sued for the same on November 12, 2010. Wife voluntarily dismissed her original suit on June 8, 2011, and then brought a new complaint for divorce on November 3, 2011, which sought alimony, child support, monetary award, and other relief.

The trial court entered judgment on June 6, 2012, awarding Husband absolute divorce from Wife and disposing of all related claims. Both parties filed motions to alter or amend, which the trial court heard on August 30, 2012. In a memorandum opinion entered September 19, 2013, the trial court granted each motion in part and denied each motion in part. Husband and Wife then filed timely appeals and cross-appeals, respectively, from both the original and amended judgments.

QUESTIONS PRESENTED

Husband presents six questions for our review, which we have re-ordered to comport with our discussion:

    I. Did the Circuit Court err in finding what Ms. Reynolds'[s] actual income was?

    II. Did the Circuit Court err in finding that Mr. Reynolds'[s] payment of expenses for the parties'[s] adult children was not a reasonable expense?

    III. Did the Circuit Court err in finding what Ms. Reynolds'[s] reasonable expenses are?

    IV. Did the Circuit Court err in its refusal to impute any employment income to Ms. Reynolds?

V. Did the Circuit Court abuse its discretion in granting Ms. Reynolds'[s] Motion to Alter or Amend with respect to amending its findings to state that no portion of Warren Place[1] was marital?

VI. Did the Circuit Court abuse its discretion in granting Ms. Reynolds'[s] Motion to Alter or Amend with respect to rounding up Ms. Reynolds'[s] expenses to account for her purported state tax liability?

In her cross-appeal, Wife presents four questions for our review, which we also

quote, but re-order:

[VII]. Whether the [Circuit] Court's Consideration of Mr. Reynolds'[s] Post-Hearing Expenses, While Refusing to Consider Similar Expenses Paid by Ms. Reynolds, was an Abuse of the Court's Discretion.

[VIII]. Whether the [Circuit] Court's Failure to Include As Marital Property Sums that Mr. Reynolds is Entitled to Receive as Refunds for Overpayment of Income Taxes Was Error.

[IX]. Whether the [Circuit] Court Abused its Discretion in Failing to Admit Evidence as to the U.S. Treasury Rate of Return and Award a Reasonable Rate of Return on Ms. Reynolds'[s] Pre-Marital Individual Retirement Account.

[X]. Whether the [Circuit] Court's Failure to Accept Ms. Reynolds'[s] Evidence as to Certain Claimed Expenses in the Absence of Any Contrary Evidence Was Clearly Erroneous.

For the reasons that follow, we answer no to all questions presented both in

_____

[1] "Warren Place" is Ms. Reynolds's current residence.

Husband's appeal and in Wife's cross-appeal, and we affirm the judgment of the Circuit

Court for Montgomery County.

FACTUAL AND PROCEDURAL HISTORY

Husband and Wife graduated from Yale Law School in the early 1980's and took

jobs with prestigious law firms in the Washington, D.C., area.[2]  The parties were married

in 1989, and the next year Wife became pregnant with twin boys and stopped working

due to her medical complications.  The twins' health problems continued after their

premature birth,[3] so the parties decided that Wife would not return to practice and would

instead raise their two children, who were joined by their younger brother in 1994.  When

Wife stopped working, she had been making approximately $120,000 per year.

Husband continued to work in private practice and by 2010 was earning over

$800,000 per year.[4]  Not surprisingly, this afforded the parties an affluent lifestyle, which

included a residence worth approximately $2 million at the time of trial,[5] household help,

---

[2] Wife also holds a master's degree in public policy and management from the Yale School of Management, while Husband had spent time as counsel to the State Department before entering private practice.

[3] Wife was hospitalized twice during her early pregnancy, and was on bed-rest for five months as she came to term.  After the boys were born, their fragile health required the constant presence of someone trained in cardiopulmonary resuscitation.

[4] According to tax planning documents available at trial in 2012, Husband was expected to make approximately $880,000 that year.

[5] Husband argued that the residence was worth approximately $2.3 million.

dinners out, private school for the children, two international vacations each year,[6] new model foreign cars, charitable donations to their alma maters, and substantial retirement savings.

The price of Husband's salary was as much as 2,700 hours of billable work per year,[7] and it apparently put a strain on the parties' relationship that slowly drove them to minor violence against each other and, in time, completely apart. By 2009, the parties were sleeping in separate parts of the house, and after attempts at counseling failed, the parties abruptly separated on July 29, 2010.[8]

During their separation, Husband rented a four-bedroom home at the cost of $5,000 per month. Meanwhile, Wife purchased a $1.52 million home, known as "Warren Place," jointly with her father, who also gave her over $100,000 between June of 2010 and April of 2011. In addition to these gifts, Wife received miscellaneous interest and dividend income, including monthly $8,000 checks from a minority interest in her family's commercial real estate company.[9]

---

[6] The Reynoldses' vacations included trips to Africa, England, Hawaii, Alaska, Italy, and Greece.

[7] This figure works out to over seven hours of *billable* work for *every day of the calendar year*.

[8] According to Wife, Husband assaulted her and took several checkbooks with him when he left the marital residence.

[9] Wife also received a one-time payment of approximately $235,000 for amounts accrued since May of 2007, when her mother died and Wife inherited her interest in the

(continued...)

-4-

Wife sued for absolute divorce on September 16, 2010, and Husband counter-sued for the same on November 12, 2010. The parties reached a custody agreement in April of 2011, giving them joint legal and shared residential custody of their youngest son, who was the only minor child at time (and who has since been emancipated by majority). Wife voluntarily dismissed her original suit on June 8, 2011, but she then brought a new complaint on November 3, 2011, demanding alimony, child support, monetary award, and other relief.

The court held five days of trial in March of 2012. There, Wife testified that she has rheumatic heart disease and will likely need valve replacement surgery as well as two leg surgeries, that she has difficulty sleeping, and that she requires psychiatric therapy. Wife also testified that she continues to employ a housekeeper, and that she spends an average of $908 per month on vacations and contributes $500 per month to a retirement savings account. Wife admitted that she had not looked for work during the parties' separation because of these divorce proceedings and due to her continued responsibility for the parties' youngest son.

Husband and Wife stipulated that the Warren Place property was worth $1.52 million, and the uncontested evidence showed that the net equity in the home was $478,559, the remaining amount financed by a mortgage with payments of $5,470 per

---

[9] (...continued)
family business.

month.  Wife claimed that she had applied $190,478.61 of non-marital funds towards the $480,000 down-payment that she made on the Warren Place property.  But the trial court found that Wife was unable to trace that $190,478.61 to the savings bonds that she claimed had been titled to her and her children, and liquidated to use for this purchase. The court therefore found that the non-marital portion of Wife's down-payment was 55.7%, with the remaining 44.3% owing to marital funds.  The court then used that figure to determine the marital portion of Wife's one-half interest in the property's net equity, arriving at an ultimate marital property value of $106,000.82.

Turning to alimony, the trial court noted that the only evidence it had of Wife's earning capacity was her salary from over two decades ago, and that Husband had failed to introduce any evidence supporting his claim that Wife could earn between $30,000 and $40,000 per year.  The court took the amount of Wife's net unearned income from her 2011 federal tax return, finding that it was $69,758 per year, or $5,813.16 per month.[10]

The trial court then examined Wife's expenses and found that a portion of her housekeeping, vacation, mortgage, and retirement expenses were reasonable.  The trial court further found that although Wife failed to introduce evidence of her physical and mental health needs, Husband had stated that $200 per month for therapy and $193 per month in extraordinary medical expenses were "realistic" figures, which the court took as

---

[10] Of this annual amount, $63,042 came from her family business.

his admission that those amounts were reasonable.[11]  The court concluded that Wife's total reasonable expenses were $15,812 per month, leaving her with a financial deficit of $9,998.84 per month.

Turning to Husband's finances, the trial court conservatively estimated his monthly net income to be $46,421.83, a figure that neither party contests.  The court found that Husband's reasonably necessary expenses for himself and for the parties' minor child totaled $14,935.72, leaving him with a surplus income of $31,486.11 per month.

The circuit court convened a supplemental day of trial on May 7, 2012, in order to deal with three discrete issues, but it ruled that evidence was otherwise closed as of the last day of regular trial on March 30, 2012.  Despite this ruling, the court learned that Husband had received $70,000 of previously undistributed income from his former firm during the present proceedings.[12]  But the court found that those funds had been spent on reasonable expenses, to wit, their minor child's tuition and Husband's attorneys, and therefore excluded the income from its marital property tabulation.

With respect to Wife's claim for alimony, the trial court based its award on Maryland Code (1984, 2012 Repl. Vol.), § 11-106(c) of the Family Law Article ("FL"),

---

[11] Wife claimed that she needed, respectively, $500 and $493 per month for those expenses.

[12] Husband disclosed this receivable prior to trial, but its amount was unknown at the time.

which authorizes an award of indefinite alimony, if the court finds that:

> (1) due to age, illness, infirmity, or disability, the party seeking alimony cannot reasonably be expected to make substantial progress toward becoming self-supporting; *or*
> (2) even after the party seeking alimony will have made as much progress toward becoming self-supporting as can reasonably be expected, the respective standards of living of the parties will be unconscionably disparate.

(Emphasis added.)

Because Husband's income of $850,365 per year was so much greater than Wife's income of $69,758 per year, the court found a gross disparity between them. Noting that this disparity alone is not determinative, the court focused upon the parties' respective standards of living and decided that it "should attempt to alleviate the disparity with alimony." The trial judge took note of Husband's efforts to impute earned income to Wife, but concluded that the amount proffered ($30,000 to $40,000) "would do little to close the gap" or "to alleviate the unconscionably disparate lifestyles" of the parties. Accordingly, after considering the parties' respective finances and needs, the court awarded Wife indefinite alimony of $13,400 per month.[13] Finally, the court entered a monetary award in favor of Wife for $14,970.09.[14]

---

[13] While there were substantial resources available to these parties, the trial court expressly rejected the American Academy of Matrimonial Lawyers' alimony guidelines as "simply too high for this case."

[14] The trial court also ordered Husband to pay child support of $2,367 per month, which the court noted was at least $1,000 less than an award extrapolated from the child support guidelines. *See Voishan v. Palma*, 327 Md. 318, 325-34 (1992) (discussing child

(continued...)

Both parties filed motions to alter or amend, each of which the court granted in part and denied in part on September 19, 2013. First, the trial court increased the alimony award to $14,194 to account for Wife's state tax liability, as shown in her 2011 federal tax return. Second, the court found that the entire down-payment for Warren Place was directly traceable to non-marital assets titled solely to Wife, and to distributions from the children's trust accounts, which were also non-marital property. The court thus concluded that Warren Place was wholly non-marital and amended its monetary award, accordingly.[15] Third, the court refused to consider Wife's evidence of additional funds that Husband had overpaid in taxes, as well as her evidence of the pre-marital rate of return on her IRA. Husband and Wife filed, respectively, appeals and cross-appeals from both the original and amended judgments, bringing the case before us.

## DISCUSSION

### Standard of Review

Before examining the detailed contentions before us, we note that Husband's arguments generally fail to distinguish between the law governing alimony and child support awards, which are authorized, respectively, by Titles 11 and 12 of the Family Law

---

[14] (...continued) support award extrapolation, generally). That award is not contested.

[15] The court also altered its finding as to Husband's shares in his former law firm, having used a $487,224 figure in the parties' pre-trial statement, rather than Mr. Reynolds's uncontradicted testimony that he owned only $113,100 worth of shares at the time of trial. The total effect of these amendments was to change the monetary award from $14,970.09 in favor of Wife, to $119,091.50 in favor of Husband.

Article.[16]  There are certainly similarities between the two awards, but they have distinct purposes and, as such, the same facts may lead to different results for each.  We shall, nevertheless, do our best to account for these differences and similarities in the discussion that follows, a task made easier because a similar standard of review applies to both awards, as well as to the monetary award based on the allocation of marital property: we review the trial court's factual findings for clear error, while each ultimate award is reviewed for abused of discretion.  *See Richards v. Richards*, 166 Md. App. 263, 271-72 (2005) (standard of review for monetary awards); *Malin v. Mininberg*, 153 Md. App. 358, 414-15 (2003) (standard of review for alimony awards); *Reuter v. Reuter*, 102 Md. App. 212, 221 (1994) (standard of review for child support awards).

As to the court's ultimate discretion, we have explained:

> "Abuse of discretion" is one of those very general, amorphous terms that appellate courts use and apply with great frequency but which they have defined in many different ways. It has been said to occur "where no reasonable person would take the view adopted by the [trial] court," *In re Marriage of Morse*, 240 Ill. App. 3d 296, 180 Ill. Dec. 563, 571, 607 N.E.2d 632, 640 (1993), or when the court acts "without reference to any guiding rules or principles." *Long John Silver's, Inc. v. Martinez*, 850 S.W.2d 773, 775 (Tex. App. 1993). It has also been said to exist when the ruling under consideration "appears to have been made on untenable grounds," *Halloran v. Town of North Canaan*, 32 Conn. App.

---

[16] Given that the parties' children are now adults, it is not clear whether Husband actually disputes the court's child support award at all.  Our opinion attempts to address both possibilities, but the difference is ultimately immaterial, given our ultimate conclusion that the trial court did not err in any of its findings or conclusions.

611, 630 A.2d 145, 147 (1993), when the ruling is "clearly against the logic and effect of facts and inferences before the court," *Shockley v. Williamson*, 594 N.E.2d 814, 815 (Ind.App.1992), when the ruling is "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result," *Novak v. Novak*, 2 Neb. App. 21, 508 N.W.2d 283, 288 (1993), when the ruling is "violative of fact and logic," *Young v. Jangula*, 176 Mich. App. 478, 440 N.W.2d 642, 643 (1989), or when it constitutes an "untenable judicial act that defies reason and works an injustice." *Moore v. Bd. of Educ. of Fulton School*, 836 S.W.2d 943, 948 (Mo. 1992).

*North v. North*, 102 Md. App. 1, 13-14 (1994).

Thus, our primary considerations are whether the trial court's factual findings were clearly erroneous, and whether its ultimate awards demonstrate an abuse of its equitable discretion. With these caveats and standards in mind, we turn to the parties' arguments.

**I.**

Husband first argues that the trial court erred when it declined to impute any income to Wife. Technically, "imputed income" is a child support concept predicated on a finding of voluntary impoverishment, which asks the court to consider several facts about a party's ability to work, including:

> (1) his or her current physical condition;
> (2) his or her respective level of education;
> (3) the timing of any change in employment or other financial circumstances relative to the divorce proceedings;
> (4) the relationship between the parties prior to the initiation of divorce proceedings;
> (5) his or her efforts to find and retain employment;
> (6) his or her efforts to secure retraining if that is needed;
> (7) whether he or she has ever withheld support;
> (8) his or her past work history;

-11-

(9) the area in which the parties live and the status of the job market there; and

(10) any other considerations presented by either party.

*Lorincz v. Lorincz*, 183 Md. App. 312, 331 (2008) (citations omitted).

Although *alimony* is a separate issue from child support, it similarly requires the court to consider "the ability of the party seeking alimony to be wholly or partly self-supporting" and "the time necessary for the party seeking alimony to gain sufficient education or training to enable that party to find suitable employment," FL § 11-106(b)(1), (b)(2). Most, if not all, of the voluntary impoverishment factors will be relevant to alimony under FL § 11-106(b)(1) and (b)(2), and so a finding of voluntary impoverishment would ordinarily entail a finding, for purposes of alimony, that the impoverished party *could* support him or herself, but *chooses* not to.

While alimony and child support awards are ultimately within the trial court's discretion, Husband attacks their factual premises. Specifically, he argues that the trial court should have found that Wife can earn between $30,000 and $40,000 annually. Husband stresses Wife's education and past earnings, but that evidence was more than two decades old; there was no evidence of what her *present* earnings would be, as a 56-year-old who has been unemployed for the latter half of her adult life and evidently has significant health issues.

The real question here is who had the burden of proof concerning Wife's earning capacity, and did that party carry his or her burden? Normally, the burden rests with the

party seeking alimony, *Turner v. Turner*, 147 Md. App. 350, 389 (2002), thus making it Wife's burden to establish her needs and inability to meet them. The trial court here was satisfied that Wife had met this burden, because the evidence demonstrated that she lacked the resources to pay her ongoing expenses, without additional income. As to her present ability to earn a reasonable living, the evidence showed that she had not practiced law for more than two decades and now suffered from health problems and advanced age, factors which would limit her employment prospects. Because Husband did not then come forward with evidence to prove that she was still employable—as an attorney or in any other capacity—the trial court was left with merely his *argument* that Wife could earn at least $30,000 to $40,000 per year, presumably because she once earned three or four times as much.

In our view, the trial court was not required to draw Husband's proposed inference here because it would have been of little value to its indefinite alimony considerations. Even with $40,000 annually in earned income, it was apparent that the unconscionable disparity in the parties' standards of living in the future could not be remedied. *See Tracey v. Tracey*, 328 Md. 380, 392-93 (1992) ("[S]elf-sufficiency per se does not bar an award of indefinite alimony if there nonetheless exists an unconscionable disparity in the parties' standards of living after divorce."). In the trial court's conservative estimation, accounting for all of Husband's reasonable expenses still leaves him with over $30,000 per month in *disposable* income, whereas Wife's income was $5,813.16 and left her with

a monthly deficit of nearly $10,000. And this was not a case where Wife was likely to progress in her career to a point where she would be self-supporting on a scale sufficient to meet her needs or bridge that income and lifestyle gap.[17] Moreover, the record supported Wife's claim because there had been no expectation pre-divorce that she return to work, even after the children no longer required her full attention or her household responsibilities lessened.

The final determination of alimony was a matter of the trial court's discretion. This included whether Wife should be "required" to work, so that if she chose not to, what she *could* earn would count against her alimony award. Stated differently, the trial court had the equitable discretion to determine *how much* progress toward becoming self-supporting could *reasonably* be expected of her. *See* FL § 11-106(c)(2). In light of what Wife did establish on the record—over twenty years of unemployment, continuing

[17] Husband also argues that it would be detrimental to all litigants if we require, as a matter of law, an expert opinion of earning potential in every case. But we need not establish such a general rule. There may be some circumstances in which expert testimony is required to establish earning potential, including *possibly* the present case, but not in *every* case. Husband's failing, rather, was that he did not introduce *any* evidence *at all* to support his position that Wife could earn between $30,000 and $40,000 annually. To infer that someone who earned $120,000 over twenty years ago would today make at least $30,000 to $40,000 is to call on the court to speculate on a host of issues. There will obviously be some cases in which a party opposing alimony or child support is unemployed, and yet there will be enough evidence of *recent* earnings to allow the court to infer what the party's earnings would be. We need not, however, decide how weighty that evidence must be, or at what point it becomes stale, for in the present case Husband's evidence was so outdated that it left Wife's present earnings as a matter of pure speculation, and thus the trial court did not clearly err when it attributed no income or earning potential to her.

medical difficulties, and a luxurious standard of living for many years preceding this divorce—we cannot say that the trial court clearly erred or abused its discretion by declining to impute earned income to Wife in its alimony award determination.

**II.**

Second, Husband argues that the trial court erred when it calculated Wife's actual monthly income. He advances two specific arguments on this point, both of which are factual questions that we review for clear error.

Husband first contends that the court's income calculation does not reflect payments that Wife received from part ownership of her family's business, which were approximately $8,000 per month during the relevant evidentiary period. In defense of the trial court's finding, Wife points to her 2011 federal tax return, which was prepared by a certified public accountant and admitted into evidence without objection. The return shows that although Ms. Reynolds received approximately $95,000 from her family business that year, only $63,042 represented income, with the rest being drawn down from her capital account (which therefore was not income but rather depletion of a fixed asset). Rather than rebut the evidence of Wife's income with evidence that the claimed deductions are materially false, counsel for Husband simply beats his drum and maintains that there was "absolutely no competent evidence" supporting the trial court's findings. Husband has failed to persuade us that a certified public accountant's estimation of business income—as opposed to withdrawals and distributions from capital stock—is

-15-

insufficient evidence of a party's income.[18]  We therefore have no reason to reverse the

trial court's finding on this point.

Second, Husband argues that when the trial court calculated Wife's monthly

income, it should have included the gifts that she received from her father over the course

of these proceedings.  In its discretion, a court *may*—based on the circumstances of the

case—consider gifts as actual income when awarding child support.  FL § 12-

201(b)(4)(iii); *Petrini v. Petrini*, 336 Md. 453, 462 (1994).  Similarly, a court considering

alimony must factor in "all income and assets," FL § 11-106(b)(11)(i), which can include

gifts, *Walter v. Walter*, 181 Md. App. 273, 287 (2008).

In *Petrini v. Petrini*, 336 Md. at 467, the Court of Appeals upheld a trial court's

child support award that counted gifts made on a "regular basis" towards the grantee's

income.  Importantly, the *Petrini* Court noted that the gifts in that case had no definite

end, and if the grantor became "unable or unwilling to continue" them, then the grantee

could petition the court for a modification of child support based on a "material change of

circumstances" under FL § 12-104.  *Petrini*, 336 Md. at 467.  Unlike the ongoing series of

gifts in *Petrini*, the payments from Wife's father in the present case had ceased abruptly,

nearly a year before trial.  From this, the court reasonably inferred that Wife's father

---

[18] *See* FL § 12-201(b)(2) ("For income from self-employment, rent, royalties,
proprietorship of a business, or joint ownership of a partnership or closely held
corporation, 'actual income' means gross receipts minus ordinary and necessary expenses
required to produce income.").

intended to assist her only while her finances were strained due to the divorce proceedings. While this case presents the opposite of *Petrini* in that Wife *stopped* receiving payments from her father, the principle announced in that case still applies: the trial court considered that Wife's father was "unable or unwilling to continue" the gifts to his daughter, and so it did not find that they represented a source of future income for her.

Again, Husband does not rebut this reasonable inference with positive evidence to the contrary; he simply insists that two years of gifts proves a father's indefinite intent to support his daughter. This argument does not persuade us. Wife's father could, of course, make *future* gifts demonstrating that he is "willing and able" to continue supporting his daughter on a regular basis. And in that case, *Petrini*, 336 Md. at 467, tells us that Husband would have grounds to seek modification of alimony (or child support) because of a material change in Wife's circumstances. *See* FL §§ 11-107 & 12-104. But, at present, Husband has given us no reason to hold that the trial court clearly erred in calculating Wife's income.

## III.

Husband next argues that the trial court erred in its alimony award by finding that his payment of expenses for the parties' adult children was not reasonable. As Wife rightly points out, there is no general common law or statutory duty to support an adult child who is not "destitute" as defined in FL § 13-101(b). *Corby v. McCarthy*, 154 Md. App. 446, 482-83 (2003). Husband nevertheless relies on *Boemio v. Boemio*, 414 Md.

118, 127-28 (2010), in which the trial court had deducted tuition payments as reasonable expenses. But the issue of tuition payments was not contested in *Boemio*, making that point mere *dicta*. Assuming that this part of *Boemio* were not *dicta*, Husband's argument remains unavailing because he failed to demonstrate that the parties had a preexisting agreement as to these payments. *Id. See also* FL § 11-106(b)(10) (when awarding alimony, the court shall consider "any agreement between the parties").

In the alternative, Husband argues that the tuition payments should have been deducted from his income because they are consistent with the standard of living that the parties enjoyed during their marriage. Assuming that the parties' standard of living in § FL 11-106(b)(3) contemplates continuing support of adult children, we still cannot accept Husband's argument because his brief contains no citations to factual support for his claim that he and Wife have a "history of supporting their adult children during their marriage." As we have often pointed out, the party making an argument bears the burden of finding and indexing factual support in the record or extract under Rule 8-504(a)(4). *See Clarke v. State*, 238 Md. 11, 23 (1965) ("[W]e cannot be expected to delve through the record extract to unearth motions or contentions that are not named and argued in the brief."), *cited in Rollins v. Capital Plaza Associates, L.P.*, 181 Md. App. 188, 201 (2008). We therefore shall not comb through the 2,904 pages of extract in this case—much less the record itself—in order to find factual support for appellant's alleged point of error.

**IV.**

Husband's fourth question presented asks whether the trial court erred when it found that Wife's mortgage, housekeeping, vacation, therapy, and retirement expenses were reasonable for purposes of awarding alimony.

Husband first attacks Wife's $5,470 mortgage payment as unreasonable and erroneously counted in the court's alimony award. Husband primarily objects to Wife's large home, and the housekeeping services attendant to it, on the grounds that they are "unnecessary" for a single, unemployed person. And while we would ordinarily agree that a four-bedroom home and domestic help are luxuries for an unemployed person living alone, the purpose of indefinite alimony in this case, as noted above, was to remove an unconscionable disparity between the parties. The trial court properly found that Husband's current income was sufficient to maintain the parties' former standard of living, thus making that the measure of "necessity" in this case. *See Tracey*, 328 Md. at 392-93; *see also Cole v. Cole*, 44 Md. App. 435, 443 (1979) (citing *Waters v. Waters*, 191 Md. 436 (1948)) ("An important factor in determining 'needs' is the station in life of the parties at the time of the divorce or enforced separation."); *see also* FL § 11-106(b)(3), (b)(11) (when awarding alimony, a court must consider "the financial needs and financial resources of each party," and "the standard of living that the parties established during their marriage"). In that light, the expenses that the trial court awarded were reasonably necessary.

Looking beyond Wife's "necessities," Husband points to the fact that the monthly payment for Warren Place is greater than that for the marital home. But the mortgage payment is larger for Warren Place than for the marital home simply because the parties chose different financing arrangements for each property. The difference in monthly payments does not reflect a fundamental difference in the total value or costs of ownership for either property; it simply reflects the fact that the parties had different levels of equity in each home. Furthermore, even if, at approximately $1.5 million, Warren Place cost more than half of the marital home, Wife's mortgaged it for only $1,000,000.[19] Hence, Husband's alimony payments account for a mortgage that is less than half of the what the parties' marital home is worth. We see no reason that a halved expense is unreasonable, particularly in light of Husband's decision to rent a four-bedroom home for himself— during the parties' separation—at the comparable rate of $5,000 per month.

Second, Husband contends that the alimony award forces him to subsidize his former father-in-law's interest in the property as Wife's joint tenant with the right of survivorship. Husband, however, points to nothing in the record to contradict the trial court's finding that Wife will in all likelihood survive her elderly father[20] and inherit the

---

[19] Husband argues that the additional equity in the house was purchased with marital funds, but we address and dispose of this argument in Part V of our opinion, below.

[20] Wife and her siblings have acted as attorneys-in-fact for their father since 2009.

property in fee simple. We therefore shall not hold that Husband's alimony payments unreasonably enrich Wife's father.

Husband next argues that the trial court erred when it found Wife's housekeeping, vacation, therapy, and retirement expenses to be reasonable and factored them into the alimony award. We disagree on all fronts, first, because both Wife's housekeeping and vacation expenses were in keeping with the parties' standard of living while married. They employed a housekeeper or *au pair* during their marriage, even when Wife was not working, and they had a history of family vacations to foreign destinations at considerably greater expense—nearly $700 per month—than the amount awarded. Second, Husband himself stated that $200 per month for therapy was "realistic," but argues that this was not an absolute admission that the expense was reasonable. Instead, reading from Husband's brief, "his concession was that if Wife saw a therapist, which she does not, $200 per month would be a reasonable amount for that expense." Thus, the only actual contention that Husband makes is that Wife "does not incur" that expense, but he presents no record evidence to rebut Wife's testimony that she does receive treatment and that she does pay her therapist in cash. Third, Husband argues that alimony should not include retirement savings expense because the court awarded Wife one-half of his retirement assets. This argument confuses stock versus flow and is equivalent to arguing that, simply because one *has accumulated* some amount of savings, there necessarily is *no need to continue* to save for the future. There is no indication, however, that one-half of Husband's

accumulated retirement assets is sufficient to secure the standard of living in retirement that the parties had planned for during their marriage. To the contrary, Husband continues to grow his retirement savings to the tune of $50,000 per year. The record therefore fully supports the trial court's finding that the parties' previous standard of living included retirement savings intended to maintain their accustomed standard of living once Husband retires.

Husband earns a surplus of monthly income large enough to pay for the present alimony award twice-over, and the expenses that Husband attacks are consistent with the parties' former standard of living. Husband's arguments are therefore unavailing, and we will not hold that the trial court clearly erred or abused its discretion in crafting alimony from these expenses.

## V.

Husband's next question asks whether the trial court erred when it granted Wife's motion to alter or amend the judgment and found that no portion of her new residence is marital property. "Marital property" is defined by FL § 8-201, as follows:

> (e)(1) "Marital property" means the property, however titled, acquired by 1 or both parties during the marriage.
> . . .
> (3) Except as provided in paragraph (2) of this subsection, "marital property" does not include property:
>     (i) acquired before the marriage;
>     (ii) acquired by inheritance or gift from a third party;
>     (iii) excluded by valid agreement; or
>     (iv) directly traceable to any of these sources.

-22-

Husband contends that when Wife spent money from the children's trust accounts to make part of the down-payment for Warren Place, she "acquired" those funds, rendering them marital property under FL § 8-201(e)(1) as a matter of law. However, Wife spent those funds as trustee for the children and did not "acquire" the funds for purposes of divorce law. If, as Husband argues, Wife's actions were *improper*, then the *children* may have recourse against her in a suit for breach of fiduciary duty, *see Hastings v. PNC Bank, NA*, 429 Md. 5, 25 (2012), but the mere expenditure of trust funds does not create in the trustee a marital property interest subject to division and award to the trustee's spouse. To so hold would subject the property of all beneficiaries to their trustee's general liabilities and undermine the very foundations of the law of trusts in Maryland.

## VI.

Lastly, Husband argues that the circuit court abused its discretion when it amended and increased Wife's alimony award to account for her projected state tax liability. Husband argues that there was "no competent evidence" of this liability because the sole evidence introduced was Wife's 2011 federal tax return, which he argues was not enough to award the taxes at the rate implied by that document. While it is of course possible that this evidence does not reflect reality, that was a matter for Husband to prove in rebuttal with positive, contrary evidence; the tax return served as *prima facie* evidence of Wife's tax burden, from which the trial court could render a finding in her favor. *See, e.g.*, FL §

12-203 (in child support determination, "suitable documentation of actual income includes . . . copies of each parent's 3 most recent federal tax returns.").[21]

Husband also argues that Wife "admitted to playing with her tax return in a way that would lessen her tax burden: claiming one half of the tax credits for the marital home despite not paying a single cent toward the expenses associated therewith." But assuming that Wife artificially deflated her tax liability on her 2011 return, this had the effect of *reducing* her alimony award. Because this determination did not aggrieve Husband, no appeal lies from it.[22] *See Bd. of Trustees of Baltimore Cnty. Cmty. Colleges v. RTKL Associates, Inc.*, 80 Md. App. 45, 51 (1989) (citing *Administrator, Motor Vehicle Administration v. Vogt*, 267 Md. 660, 664 (1973)).

## VII.

Turning to Wife's cross-appeal, her first question presented asks whether the trial court erred in accounting for their marital property when it deducted Husband's post-trial expenses from his assets. The court had ruled that evidence was closed on March 30, 2012, and that the additional proceedings on May 7, 2012, would address only three

---

[21] Husband's opening brief also argues that the trial court erred when it admitted a "chart" into evidence when ruling on Wife's motion to alter or amend. In the transcript passage that he cites, however, the court refers to a chart prepared on a *different* issue, and *contrasts* that with the *absence* of a chart showing Wife's income tax liability. It therefore appears that no such chart was admitted or considered by the trial court.

[22] We can envision a scenario in which Husband *may* have been aggrieved: if Wife's taking these deductions prevented *him* from doing so. Husband has not, however, raised this issue.

issues: 1) admissibility of certain evidence relating to Wife's family business; 2) the children's custodial accounts; and 3) the marital portion of one of Husband's retirement accounts. Importantly, Wife does not challenge that order, in and of itself, and so she concedes that any evidence discovered after the last day of regular trial would have to have been introduced in new proceedings.

It was nonetheless disclosed on May 7 that Husband had received approximately $70,000 in a final distribution from his previous law firm. But the court found that the funds had been expended reasonably on attorney's fees and tuition expenses and, because of this, that "these funds no longer exist and have not been dissipated." The court therefore did not adjust its marital property findings or award to account for Husband's distribution.

Wife argues that, having accounted for Husband's "post-trial"[23] fees and expenses, the trial court acted inconsistently—and so in error—when it did not also account for *her* post-trial fees and expenses. Any error, however, was harmless in light of the trial court's ruling that closed evidence as of March 30, 2012. By the terms of that ruling— which, again, Wife does not contest—the court should have admitted *neither* evidence of Husband's $70,000 distribution, *nor* evidence of *either* party's post-trial expenses. Consequently, the trial court should not have adjusted its monetary award to account for

_____

[23] Technically, trial *continued* on May 7, 2012, but that day was an ancillary proceeding, and to simplify our discussion we shall simply refer to proceedings after March 30, 2012, as "post-trial."

either party's post-trial expenses, and indeed it did not. The end result was therefore the same as if the court had adhered strictly to its ruling that no post-trial evidence would be admitted, and Wife's argument that the court's inconsistency was reversible error fails.

## VIII.

Next, Wife argues that the trial court erred when it did not count as marital property certain tax refunds that she expected Husband to receive. But as in the last issue presented, Wife relies on a phantom inconsistency. She acknowledges that the trial court declined to consider these refunds because the evidence arose after March 30, 2012. She then contends that the trial court acted arbitrarily because "it did credit Husband[] for certain expenses he incurred during that time period, while disallowing Wife'[s] similar expenses." But as explained above, there was no actual inconsistency or error in excluding that evidence, and Wife does not otherwise contest the ruling that originally closed evidence. Again, Wife gives us no reason to disturb the trial court's monetary award.

## IX.

Wife's cross-appeal next argues that the trial court erred when it refused to admit evidence of the rate of return on United States Treasury Notes during the parties' marriage to show that certain funds in her retirement account were non-marital. *See Noffsinger v. Noffsinger*, 95 Md. App. 265, 282 (1993) (burden of proof is on party seeking to have property declared non-marital). "We generally review rulings on the

admissibility of evidence applying an abuse of discretion standard." *Gillespie v. Gillespie*, 206 Md. App. 146, 165 (2012).

The trial court found that Wife's IRA was worth $30,443.28 when the parties were wed and $133,519 at the time of trial, but there were no records indicating the account's balance during the intervening time. Wife proffered evidence of the rate of return on U.S. Treasuries and argued that the trial court should impute at least that rate to the $30,443.28 IRA balance when the parties were wed, and so find that approximately $64,000 of the balance at trial was non-marital property. The court, however, reasoned that it was unclear whether the IRA contained U.S. Treasuries, and found that "it is not clear that the treasury bill rate is an accurate reflection of the growth that may have occurred in this account." The court concluded that it "was not willing to speculate" that the U.S. Treasury rate reflected the IRA growth, and therefore it found that the non-marital portion was exactly $30,443.28.

We agree that a trial court could, in principle, attribute a reasonable rate of return to assets, and that the rate on U.S. Treasuries would be a conservative estimate of returns for nearly any asset. But the present case required the trial court to reconstruct accounts long neglected and lost and factor in possible losses, withdrawals, and deposits, of which there remained no record. Such complex financial accounting was beyond the scope of the court's ordinary fact-finding ability, and it required expert testimony, which Wife did not provide. *See Gallagher v. Gallagher*, 118 Md. App. 567, 578-79 (1997), *cited in*

*Walker v. Grow*, 170 Md. App. 255, 273-77 (2006). We therefore conclude that the trial court did not abuse its discretion when it took account of its own limitations and refused to speculate as to matters beyond its knowledge.

**X.**

Finally, Wife asks us to hold that the trial court erred when it failed to find that the full amount of personal expenses she requested were reasonable (some of which were also the subject of Husband's appeal and are discussed above from the opposite perspective).

Wife first argues that the trial court clearly erred because its alimony calculation used her actual expense of $396 per month for home *repairs*, but did not include the "uncontradicted" amount of $1,149 per month for her home *improvement* expenses in 2011. Wife further argues that the trial court should have found that her claimed expense of $804 per month for replacement furnishings was reasonable, having actually spent $2,663 per month in that category in 2011. But the monthly home furnishing, repair, and improvement expenses that Wife claimed do not justify *indefinite* monthly payments of those amounts. In her financial statement, Wife contended that she needed to replace the appliances in Warren Place at the total cost of approximately $9,266, which she amortized *over five years* at $154 per month. She also claimed that Warren Place was in immediate need of a new roof, which would cost $240 per month, again *over five years*. She gave no reason, however, why these amortized payments should be considered reasonable *in*

-28-

*perpetuity*. Similarly, she estimated that to furnish Warren Place completely would cost $650 per month, but she did not even give a time period over which those payments were estimated. The trial court rightly disregarded these inflated estimates of Wife's future monthly expenses for furnishings, repairs, and improvements at Warren Place.

Second, Wife argues that the trial court erroneously ignored her testimony that she was seeing a therapist and that she was paying in cash at the rate of $500 per month. While this testimony was indeed "uncontradicted," it also was not corroborated. Thus, the matter of her expenses was one of pure credibility, and we have no reason to disturb the trial court's determination that Wife's present and future expenses are significantly less than her personal estimation.[24] *See Keys v. Keys*, 93 Md. App. 677, 688, 614 A.2d 975, 980 (1992) ("[E]specially in the arena of marital disputes where notoriously the parties are not in agreement as to the facts, . . . we must be cognizant of the court's position to assess the credibility and demeanor of each witness.").

Finally, the trial court did not abuse its discretion in setting Wife's alimony award. Just as Husband's arguments skirted his high income, Wife essentially asks us to overlook her own significant personal assets. Wife's alimony will bring her total annual income to $230,558 and afford her luxuries in keeping with the parties' previous lifestyle, including

---

[24] We note that the trial court was free to accept Wife's testimony only in part, *Loyola Fed. Sav. Bank v. Hill*, 114 Md. App. 289, 306-07 (1997), and so there is no conflict between our holding, here, that the trial court could reject *Wife's* claim that her therapy expenses were $500 per month, and our holding, above, that the trial court *also* could reject *Husband's* claim that the true expense is $0.

a large home, household help, salon services, health club membership, and a luxury vehicle.  For these reasons, none of Wife's arguments persuades us that the trial court clearly erred or abused its discretion in crafting her sizeable alimony award.

**JUDGMENT AFFIRMED.  COSTS TO BE PAID 50% BY APPELLANT AND 50% BY APPELLEE.**